STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. CURTIS
GILMORE, JR., DEFENDANT-RESPONDENT.

Argued February 19, 1986—Decided July 16, 1986.

512

*Steven J. Kaflowitz*, Assistant Prosecutor, argued the cause for appellant (*John H. Stamler*, Union County Prosecutor, attorney).

*Martin L. Greenberg* argued the cause for respondent (*Greenberg, Margolis, Ziegler & Schwartz*, attorneys).

*Abbie P. Maliniak*, Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*W. Cary Edwards*, Attorney General, attorney).

*Peter B. Meadow*, Assistant Deputy Public Defender, argued the cause for *amicus curiae* Public Defender (*Thomas S. Smith, Jr.*, Acting Public Defender, attorney).

*Theodore V. Wells, Jr.*, and *Robert L. Krakower*, submitted a brief on behalf of *amicus curiae* New Jersey Association of Criminal Defense Lawyers (*Lowenstein, Sandler, Brochin, Kohl, Fisher, Boylan & Meanor*, attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents the issue whether a prosecutor's use of peremptory challenges to exclude every black potential petit

juror violates a defendant's constitutional right to trial by an impartial jury drawn from a representative cross-section of the community. This is a question of first impression for us. We hold that Article I, paragraphs 5, 9, and 10 of the New Jersey Constitution forbid a prosecutor to exercise peremptory challenges to remove potential petit jurors who are members of a cognizable group on the basis of their presumed group bias; the State, however, may peremptorily challenge such venirepersons on grounds of situation-specific bias. Moreover, we determine that the defendant here has established that the prosecutor impermissibly excluded all black potential petit jurors.

## I

In a single jury trial, defendant was found guilty of three first-degree robberies of two Hispanic attendants at a gasoline station in Union, New Jersey. He was sentenced to three concurrent fifteen-year custodial terms with five years of parole ineligibility.

Defendant, who is black, was tried by an all-white jury made up of six males and six females. Defense counsel was black and the assistant prosecutor was white. During the jury selection, nine black potential jurors were seated in the jury box at different times. All nine were excused—the assistant prosecutor challenged two for cause, and peremptorily challenged the remaining seven. All told, the assistant prosecutor exercised eleven of the twelve peremptory challenges allowed him by Rule 1:8–3(d), while defense counsel exhausted the twenty permitted him.

After the jury selection, but before the jury was sworn, defense counsel moved for a mistrial, contending that the assistant prosecutor had used his peremptory challenges unconstitutionally to excuse the remaining seven black venirepersons on the basis of race. The assistant prosecutor responded: "It's my understanding of the rules that I can exercise my peremptory challenges as I see fit." The trial judge, relying heavily on

*Swain v. Alabama,* 380 *U.S.* 202, 85 *S.Ct.* 824, 13 *L.Ed.*2d 759 (1965), and *State v. Smith,* 55 *N.J.* 476, 479–84, *cert.* denied, 400 *U.S.* 949, 91 *S.Ct.* 232, 27 *L.Ed.*2d 256 (1970), rejected defendant's constitutional argument and accordingly denied the motion. On defendant's appeal following his conviction, the Appellate Division—pointing out that in *Swain* the majority conceded that circumstances might arise where "[t]he purposes of the peremptory challenge are being [perverted]," 380 *U.S.* at 224, 85 *S.Ct.* at 838, 13 *L.Ed.*2d at 774, and heeding the strong recommendation of Justices Stevens, Blackmun and Powell (as well as Justices Marshall and Brennan) respecting the denial of *certiorari* in *McCray v. New York,* 461 *U.S.* 961, 963, 103 *S.Ct.* 2438, 2439, 77 *L.Ed.*2d 1322, 1323 (1983), that state courts should serve "as laboratories in which the issue receives further study before it is addressed by [the United States Supreme] Court"—remanded the case to the Law Division to conduct a hearing "to establish the identity of the black prospective jurors and to afford the assistant prosecutor an opportunity to establish his motive or reasons for excusing each of the seven prospective black jurors." *State v. Gilmore,* 195 *N.J.Super.* 163, 166 (1984).

At the remand hearing, the parties stipulated to the identity of six of the seven Blacks peremptorily challenged, and agreed that the seventh was either of two persons. Then the assistant prosecutor articulated both his general criteria for exercising peremptory challenges and his specific reasons for excluding each black prospective juror in this case. First, he stated that he wanted jurors who were (1) able to ignore theatrics; (2) more intelligent and of the professional type; and (3) without maternal family instincts. And second, relying upon the transcript of the jury selection and notes he had made after the trial judge denied defendant's motion for a mistrial, he applied these criteria (as well as a residual criterion of "gut reaction" based upon "my life experience") to explain each peremptory challenge of a black venireperson.

On March 8, 1985, the Appellate Division issued its second opinion, interpreting the New Jersey Constitution as "proscribing the use of peremptory challenges to exclude prospective jurors solely by virtue of their membership in, or affiliation with, a cognizable group, a practice designed to defeat the purpose of the representative cross section rule." *State v. Gilmore*, 199 *N.J.Super.* 389, 405–06 (1985). After defining guidelines for the permissible exercise of peremptory challenges and establishing the procedure and burden of proof for allegations of their improper use, the Appellate Division evaluated the assistant prosecutor's explanations of his reasons for excusing every one of the black jury members. It concluded that they were " 'sham excuses belatedly contrived to avoid admitting acts of group discrimination against all the black prospective jurors.' " *Id.* at 412–13 (quoting *People v. Wheeler*, 22 *Cal.*3d 258, 148 *Cal.Rptr.* 890, 583 *P.*2d 748, 765 (Cal.1978)). Hence, the court reversed the conviction, remanding the case to the Law Division for a new trial.

We granted certification, 101 *N.J.* 285 (1985), and now affirm the judgment rendered in the well-reasoned opinion of the Appellate Division.

## II

Subsequent to the Appellate Division's decision to serve as a laboratory in federalism by resting its opinion on independent state constitutional grounds, the United States Supreme Court overruled *Swain v. Alabama* in *Batson v. Kentucky*, 476 *U.S.* ——, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69 (1986). In *Swain*, the first case to address directly the federal constitutional validity of the use of peremptory challenges to discriminate on the basis of race, a closely divided Supreme Court had concluded: "[W]e cannot hold that the striking of Negroes in a particular case is a denial of equal protection of the laws." 380 *U.S.* at 221, 85 *S.Ct.* at 836, 13 *L.Ed.*2d at 773. In dictum, four members of the Court indicated that if the defendant could show that the

prosecutor had systematically excluded all Blacks in case after case over a period of time, the presumption protecting the exercise of peremptory challenges "may well be overcome." *Id.* at 224, 85 *S.Ct.* at 838, 13 *L.Ed.*2d at 774. The Court opined that this presumption was not overcome in *Swain* itself, although the defendant offered evidence that no Black had ever served on a petit jury in Talladega County, Alabama. Yet if ever there were a case in which it would appear that *Swain's* standard of proof could be met, *Swain* itself surely was the one. Indeed, as of 1977, no defendant had ever surmounted this burden, despite proof in many instances that created a reasonable if not unmistakeable inference of racial discrimination. *See* Annot., "Use of Peremptory Challenge to Exclude from Jury Persons Belonging to a Class or Race," 79 *A.L.R.*3d 14 (1977) (collecting the federal and state cases in a sixty-page annotation); J. Van Dyke, *Jury Selection Procedures: Our Uncertain Commitment to Representative Panels* 156 n. 83–98 (1977) (listing more than fifty cases). By 1984, the Second Circuit indicated in *McCray v. Abrams,* 750 *F.*2d 1113, 1120 (1984), that *Swain's* "mission impossible" had been accomplished in only one instance, involving a prosecutor who admitted the practice of striking Blacks and whose use of peremptory challenges had been repeatedly appealed by black defendants. *State v. Brown,* 371 *So.*2d 751 (La.1979), and *State v. Washington,* 375 *So.*2d 1162 (La.1979).

Before the Supreme Court threw off *Swain's* "crippling burden of proof" in *Batson supra,* 476 *U.S.* at ——, 106 *S.Ct.* at 1720, 90 *L.Ed.*2d at 85, *Swain* had effectively immunized prosecutors' exercise of peremptory challenges from federal constitutional scrutiny and hence had been "the subject of almost universal and often scathing criticism." *McCray v. New York, supra,* 461 *U.S.* at 964, 103 *S.Ct.* at 2440, 77 *L.Ed.*2d at 1324 (Marshall, J., dissenting from the denial of certiorari). This prompted leading state courts to look to their state constitutions as sources of fundamental rights surpassing those guaranteed by the federal constitution. *People v. Wheeler,*

*supra,* 22 *Cal.*3d 258, 148 *Cal.Rptr.* 890, 583 *P.*2d 748 (Cal. 1978); *Commonwealth v. Soares,* 377 *Mass.* 461, 387 *N.E.*2d 499, *cert.* den., 444 *U.S.* 881, 100 *S.Ct.* 170, 62 *L.Ed.*2d 110 (1979); *State v. Neil,* 457 *So.*2d 481 (Fla.1984); *State v. Crespin,* 94 *N.M.* 486, 612 *P.*2d 716 (Ct.App.1980). The Appellate Division here followed their lead, concluding that Article I, paragraphs 5, 9, and 10 of the New Jersey Constitution provide greater protection against a prosecutor's discriminatory use of peremptory challenges than the United States Supreme Court had afforded under the Equal Protection Clause of the United States Constitution. 199 *N.J.Super.* at 397.

Furthermore, between *Swain* and *Batson,* the United States Supreme Court had issued *Taylor v. Louisiana,* 419 *U.S.* 522, 95 *S.Ct.* 692, 42 *L.Ed.*2d 690 (1975), and *Duren v. Missouri,* 439 *U.S.* 357, 99 *S.Ct.* 664, 58 *L.Ed.*2d 579 (1979), decisions interpreting the Sixth Amendment right to trial by an impartial jury that were at least implicitly in tension with *Swain*'s interpretation of the Equal Protection Clause. This moved some federal courts to resolve this tension in favor of construing the Sixth Amendment right more expansively. *See McCray v. Abrams, supra,* 750 *F.*2d 1113; *Booker v. Jabe,* 775 *F.*2d 762 (6th Cir.1985); *see also United States v. Leslie,* 759 *F.*2d 366, 373 (5th Cir.1985)[1] (resorting not to the Sixth Amendment but to the court's "supervisory power to assure a minimum level of protection against the use of peremptory challenges to practice invidious discrimination in individual cases").

In the midst of these developments, the Supreme Court decided *Batson,* rejecting the heavy burden of proof that *Swain* had imposed on the defendant to establish that the peremptory challenge system as a whole was being perverted. Instead, the Court held that the Equal Protection Clause of the Fourteenth Amendment forbids a prosecutor from exercising

---

[1]The Fifth Circuit *en banc* reversed the panel's holding prior to *Batson. United States v. Leslie,* 783 *F.*2d 541 (1986). But *Batson* for all practical purposes reinstates the panel's holding.

peremptory challenges to remove jurors on the basis of their race, and that a defendant may make a *prima facie* showing of purposeful racial discrimination in the selection of the jury by relying solely on the facts concerning his or her particular case. In deciding *Batson,* the Court relied on the application of equal protection principles, expressing "no view on the merits of any of petitioner's Sixth Amendment arguments." 476 *U.S.* at —— n. 4, 106 *S.Ct.* at 1716 n. 4, 90 *L.Ed.*2d at 79 n. 4. We observe that under *Batson*'s interpretation of the Equal Protection Clause of the Fourteenth Amendment, and *McCray v. Abrams'* interpretation of the Sixth Amendment, the United States Constitution would compel the result that we reach on independent state grounds.

That the United States Supreme Court has overruled *Swain* in *Batson* does not mean that the laboratories operated by leading state courts should now close up shop. For one thing, *Batson* rests on federal grounds of equal protection, whereas *Wheeler* and its progeny rest on state constitutional rights to trial by an impartial jury. For another, *Batson* is not the final word in this area—as the majority recognized, and as Justice White emphasized in concurrence, "[m]uch litigation will be required to spell out the contours of the Court's Equal Protection holding...." 476 *U.S.* at —— n. 24 & ——, 106 *S.Ct.* at 1724 n. 24 & 1725, 90 *L.Ed.*2d at 90 n. 24 (majority) & 91 (White, J., concurring).

 Accordingly, we base our decision on the New Jersey Constitution, which protects fundamental rights independently of the United States Constitution. *See* "Symposium: The Emergence of State Constitutional Law," 63 *Tex.L.Rev.* 959 (1985) (especially Pollock, "Adequate and Independent State Grounds as a Means of Balancing the Relationship Between State and Federal Courts," *id.* at 977; and Utter, "Swimming in the Jaws of the Crocodile: State Court Comment on Federal Constitutional Issues when Disposing of Cases on State Constitutional Grounds," *id.* at 1025); Pollock, "State Constitutions as

Separate Sources of Fundamental Rights," 35 *Rutgers L.Rev.*
707 (1983); Handler, "Expounding the State Constitution," 35
*Rutgers L.Rev.* 202 (1983); Brennan, "State Constitutions and
the Protection of Individual Rights," 90 *Harv.L.Rev.* 489 (1977).
We previously have construed our state constitution as provid-
ing greater protection to our citizens' individual rights than
accorded them under the federal constitution. *State v. Wil-
liams,* 93 *N.J.* 39 (1983); *State v. Hunt,* 91 *N.J.* 338, 353 (1982);
*State v. Schmid,* 84 *N.J.* 535, 537 (1980), appeal dism'd. *sub
nom. Princeton Univ. v. Schmid,* 455 *U.S.* 100, 102 *S.Ct.* 867,
70 *L.Ed.*2d 855 (1982). We do so here as well. In this regard,
the Appellate Division tersely and aptly summarized the history
of our state constitutional right to trial by an impartial jury
drawn from a representative cross-section of the community.
199 *N.J.Super.* at 398.[2] We refer to federal constitutional law

---

[2]The Appellate Division wrote:

 That guarantee has long and consistently been articulated in our case
 law. As long ago as 1900, the then Court of Errors and Appeals held that
 prospective jurors may not be "designedly excluded on account of color"
 from petit jury lists. *Bullock v. State,* 65 *N.J.L.* 557, 564 (E. & A. 1900). In
 *State v. Stewart,* 2 *N.J.Super.* 15, 24 (App.Div.1949), Judge (later Justice)
 Jacobs stated that "in the drawing of jury panels, grand or petit, there must
 be no intentional discrimination against persons because of their color."
 And in *State v. Rochester,* 54 *N.J.* 85 (1969), our Supreme Court found that
 "[n]o one may be disqualified from service as a grand or petit juror
 because of 'race, color, creed, national origin, or ancestry' " (citing *N.J.S.A.*
 2A:72–7) and held that "[t]he methods of selection must be so designed as
 to insure that juries are impartially drawn from community cross-sec-
 tions." 54 *N.J.* at 88. (citations omitted). Our cases accord with a long
 line of federal cases. *Williams v. Florida,* 399 *U.S.* 78, 100, 90 *S.Ct.* 1893,
 1905, 26 *L.Ed.*2d 446, 460 (1970); *Apodaca v. Oregon,* 406 *U.S.* 404,
 410–411, 92 *S.Ct.* 1628, 1632–1633, 32 *L.Ed.*2d 184, 191 (1972); *Johnson v.
 Louisiana,* 406 *U.S.* 356, 378, 92 *S.Ct.* 1620, 1642, 32 *L.Ed.*2d 152, 169
 (1972); *Smith v. Texas,* 311 *U.S.* 128, 61 *S.Ct.* 164, 85 *L.Ed.* 84 (1940).
 Even though New Jersey established the representative cross-section rule
 as early as 1949 in *Stewart,* the rule, however, was not made applicable to
 the states through the Sixth Amendment until the decisions in *Duncan v.
 Louisiana,* 391 *U.S.* 145, 88 *S.Ct.* 1444, 20 *L.Ed.*2d 491 (1968), reh. den. 392
 *U.S.* 947, 88 *S.Ct.* 2270, 20 *L.Ed.*2d 1412 (1968) and *Taylor v. Louisiana,* 419
 *U.S.* 522, 95 *S.Ct.* 692, 42 *L.Ed.*2d 690 (1975). See *State v. Porro,* 158

only as establishing the floor of minimum constitutional protection. Furthermore, when we cite federal or other state court opinions in construing the provisions of our Constitution, we rely upon them merely for the purpose of guidance, not as compelling the result we reach on independent state grounds.

### III

First, we must analyze the defendant's constitutional right to trial by an impartial jury under Article I of the New Jersey Constitution. Paragraph 5 provides that "[n]o person shall be denied the enjoyment of any civil ... right, nor be discriminated against in the exercise of any civil ... right, ... because of religious principles, race, color, ancestry or national origin." Furthermore, we have interpreted paragraph 1 as prohibiting such discrimination on the basis of sex. *Peper v. Princeton Univ. Bd. of Trustees*, 77 *N.J.* 55, 79 (1978). Paragraph 9 provides that "[t]he right of trial by jury shall remain inviolate...." Finally, paragraph 10 provides that "[i]n all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury...." Read together, these provisions guarantee that in all criminal prosecutions the defendant is entitled to trial by an impartial jury without discrimination on the basis of religious principles, race, color, ancestry, national origin, or sex.

This right to trial by an impartial jury, in our heterogeneous society where a defendant's "peers" include members of many diverse groups, entails the right to trial by a jury drawn from a representative cross-section of the community. The principal rationale for this entailment, expressed best by the California Supreme Court in *People v. Wheeler, supra,* 22 *Cal.* 3d 258, 148 *Cal.Rptr.* 890, 583 *P.*2d 748, 755 (Cal.1978),

*N.J.Super.* 269 (App.Div.1978), *cert.* den. 439 *U.S.* 1047, 99 *S.Ct.* 724, 58 *L.Ed.*2d 706 (1978).
[199 *N.J.Super.* at 398.]

is that in our heterogeneous society jurors will inevitably belong to diverse and often overlapping groups defined by race, religion, ethnic or national origin, sex, age, education, occupation, economic condition, place of residence, and political affiliation; that it is unrealistic to expect jurors to be devoid of opinions, preconceptions, or even deep-rooted biases derived from their life experiences in such groups; and hence that the only practical way to achieve an overall impartiality is to encourage the representation of a variety of such groups on the jury so that the respective biases of their members, to the extent they are antagonistic, will tend to cancel each other out.

In short, the main point of the representative cross-section rule is "to achieve an overall impartiality by allowing the interaction of diverse beliefs and values the jurors bring from their group experiences," *Wheeler, supra,* 583 *P.*2d at 761, and in this manner to vindicate the defendant's right to trial by an impartial jury in our heterogeneous society. The point is not to guarantee proportional representation of every diverse group on every jury, let alone to mandate disproportional representation by setting aside a spot for every discrete group on every jury.

Article I, paragraph 5 implicates not only the defendant's civil rights but also those of citizens generally—and, historically, one of the rights and obligations of citizenship has been to participate in the administration of justice by serving on grand and petit juries. Concomitantly, the representative cross-section rule not only promotes the overall impartiality of the deliberative process but also enhances the legitimacy of the judicial process in the eyes of the public by serving the following "other essential functions": "legitimating the judgments of the courts, promoting citizen participation in government, and preventing further stigmatizing of minority groups." *Wheeler, supra,* 583 *P.*2d at 755 n. 6. *See* Note, "Limiting the Peremptory Challenge: Representation of Groups on Petit Juries," 86 *Yale L.J.* 1715, 1725–31, 1736 (1977).

Along these lines, both federal and state courts have often repeated the seminal language of *Smith v. Texas,* 311 *U.S.* 128, 130, 61 *S.Ct.* 164, 165, 85 *L.Ed.* 84, 86 (1940) (footnote omitted):

It is part of the established tradition in the use of juries as instruments of public justice that the jury be a body truly representative of the community.

> For racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.

*See Thiel v. Southern Pac. Co.*, 328 *U.S.* 217, 220, 66 *S.Ct.* 984, 985, 90 *L.Ed.* 1181, 1185 (1946); *Ballard v. United States*, 329 *U.S.* 187, 192–94, 67 *S.Ct.* 261, 263–65, 91 *L.Ed.* 181, 185–86 (1946); *Peters v. Kiff*, 407 *U.S.* 493, 503–04, 92 *S.Ct.* 2163, 2168–69, 33 *L.Ed.*2d 83, 94 (1972); *Taylor v. Louisiana, supra,* 419 *U.S.* at 530–31, 95 *S.Ct.* at 697–98, 42 *L.Ed.*2d at 698 (1975).

■ Recognizing this, we have noted that "no one may be disqualified from service as a grand or petit juror because of 'race, color, creed, national origin, or ancestry' " (citing former *N.J.S.A.* 2A:72–7), and held that "[t]he methods of selection must be so designed as to insure that juries are impartially drawn from community cross-sections." *State v. Rochester*, 54 *N.J.* 85, 88 (1969). The present *N.J.S.A.* 2A:72–7 provides that "[n]o citizen possessing all other qualifications prescribed by law shall be disqualified for service as a grand or petit juror in any court on account of race, color, creed, national origin, ancestry, marital status or sex." The statute thus is congruent with Article I, paragraph 5, taken together with Article I, paragraph 1, as to the impermissible bases of discrimination in the exercise of civil rights. The State's specific obligation to afford trial by an impartial jury under the representative cross-section rule therefore accords with its general obligation to govern impartially under equal protection principles.

■ The representative cross-section rule, if it is to be adequate to serve its principal and subsidiary functions, must at least prohibit discrimination against these discrete, cognizable groups.[3] Moreover, it must apply not merely to methods of

---

[3]Article I, paragraphs 5 and 1 define the core cognizable groups for purposes of impartial jury analysis under the representative cross-section rule, but are not necessarily definitive of those groups. That is, at minimum, cognizable groups include those defined on the basis of religious principles, race, color,

selection of the jury venire but as well to methods of selecting the petit jurors from the jury venire, and so to the stage of exercising challenges for cause and peremptory challenges.

That is, the constitutional right to trial by an impartial jury—which of necessity is the right to trial by an impartial *petit jury*—is not merely the right to an impartial *jury venire* drawn from a representative cross-section of the community. In *McCray v. Abrams,* the Second Circuit incisively drained the distinction between jury venire and petit jury of the force it has been alleged to have in this context:

> If there is a Sixth Amendment requirement that the venire represent a fair cross section of the community, it must logically be because it is important that the defendant have the chance that the petit jury will be similarly constituted. The necessary implication is that the Sixth Amendment guarantees the defendant that possibility. It guarantees not that the possibility will ripen into actuality, but only the fair and undistorted chance that it will. [*Id.* at 1128–29.]

This is precisely the holding of the Appellate Division below, although on state constitutional grounds. 199 *N.J.Super.* at 400–01. To the same effect is Justice Marshall's trenchant observation that "[t]here is no point in taking elaborate steps to ensure that Negroes are included on venires simply so they can then be struck because of their race by a prosecutor's use of peremptory challenges." *McCray v. New York, supra,* 461 *U.S.* at 968, 103 *S.Ct.* at 2442, 77 *L.Ed.*2d at 1325–26 (Marshall,

---

ancestry, national origin, and sex (all of which are suspect or semi-suspect classifications triggering strict or intermediate scrutiny under federal equal protection analysis, *see Cleburne v. Cleburne Living Centers,* 473 *U.S.* ——, 105 *S.Ct.* 3249, 87 *L.Ed.*2d 313 (1985)). Both federal and state courts are divided as to whether groups defined by age, economic status, and occupation, for example, might in particular cases in certain communities be cognizable groups. *See* Note, "Limiting the Peremptory Challenge: Representation of Groups on Petit Juries," 86 *Yale L.J.* 1715, 1735 (1977). Indeed, some courts are divided amongst themselves on these issues. *See Barber v. Ponte,* 772 F.2d 982 (1st Cir.1985). *But see Anaya v. Hanson,* 781 F.2d 1 (1st Cir.1986). We need not resolve these questions, or the question whether other groups protected by the New Jersey Law Against Discrimination, *N.J.S.A.* 10:5–4, for example, veterans and the handicapped, might in certain contexts be cognizable groups. For, whatever the criteria for deciding such questions, Blacks clearly constitute a cognizable group.

J., dissenting from the denial of certiorari). In short, neither the United States Constitution nor the New Jersey Constitution protects merely the right to an impartial jury venire.

Finally, Article I, paragraph 9 protects the right of *every* defendant "in *all* criminal prosecutions" (emphasis added) to trial by an impartial jury. This is not merely a right held by the last in a series of defendants to be deprived of an impartial jury through systematic invidious discrimination in its methods of selection. In *McCray v. Abrams*, the Second Circuit construed the federal counterpart, the Sixth Amendment,

> to require the court to decide each case on the basis of the acts or practices complained of in that very case, and not to require the defendant to show, as *Swain* requires for an equal protection claim, that those acts or practices have had undesirable effects in case after case.
>
> [750 *F.*2d at 1130.]

Dissenting from the denial of *certiorari* in *McCray v. New York, supra,* Justice Marshall, joined by Justice Brennan, made a similar argument, emphasizing not only "the Sixth Amendment right of every defendant," 461 *U.S.* at 970, 103 *S.Ct.* at 2443, 77 *L.Ed.*2d at 1326, but also the right of every defendant to equal protection of the laws: "Since *every* defendant is entitled to equal protection of the laws and should therefore be free from the invidious discrimination of state officials, it is difficult to understand why several must suffer discrimination because of the prosecutor's use of peremptory challenges before any defendant can object." *Id.* at 964, 103 *S.Ct.* at 2440, 77 *L.Ed.*2d at 1324. After all, it is not merely discrimination through systematic exclusion, but all forms of invidious discrimination, that the United States Constitution and the New Jersey Constitution forbid. The United States Supreme Court in *Batson* therefore repudiated *Swain*'s "systematic exclusion rule." We eschew it in the first place.

If the constitutional right to trial by an impartial jury drawn from a representative cross-section of the community is not limited to a "systematic exclusion rule," then neither does it extend to a "systematic inclusion rule." That is, it does not

require the systematic inclusion of cognizable groups. The right to trial by an impartial jury hence entails not a requirement that petit juries actually chosen must be an exact microcosm of the community, but rather the guarantee that the State's use of peremptory challenges "may not restrict unreasonably the possibility that the petit jury will comprise a representative-cross section of the community." 199 *N.J.Super.* at 401.[4] Peremptory challenges on grounds of presumed group bias as distinguished from situation-specific bias (as we define these terms below) unreasonably restrict this possibility.

## IV

In accommodating the representative-cross-section rule and the peremptory challenge, we must bear in mind that the defendant's right to trial by an impartial jury drawn from a representative cross-section of the community is of constitutional dimensions. On the other hand, the prosecutor's right to exercise peremptory challenges is merely a product of the Legislature's and the Supreme Court's rule-making authority. *See N.J.S.A.* 2A:78–7 and *R.* 1:8–3(a). It is merely a statutory "incident" of the constitutional right to trial by an impartial jury. *Wright v. Bernstein,* 23 *N.J.* 284, 293 (1957). As such, it must be confined to further, not allowed to undermine, the constitutional right.

The Legislature, in designing methods of selection of impartial petit juries, both has prohibited discrimination against discrete groups (in *N.J.S.A.* 2A:72–7) and has provided for the exercise of challenges for cause and peremptory challenges (in *N.J.S.A.* 2A:78–7). Peremptory challenges, when

---

[4]*Cf. McCray v. Abrams, supra,* 750 *F.*2d at 1128–29 ("[i]t guarantees not that the possibility will ripen into actuality, but only the fair and undistorted chance that it will"); *Wheeler, supra,* 583 *P.*2d at 762 ("[w]hat it does mean ... is that a party is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits").

properly used, are intended to insure that the triers of fact will be "as nearly impartial 'as the lot of humanity will admit.'" *State v. Singletary*, 80 *N.J.* 55, 62 (1979); *State v. Deatore*, 70 *N.J.* 100, 105–06 (1976); *State v. Jackson*, 43 *N.J.* 148, 158 (1964). The representative-cross-section rule by itself is insufficient to insure an impartial jury, however demographically representative a jury venire it may draw; it works in tandem with challenges for cause and peremptory challenges to pursue an impartial petit jury. Understood in this way, as parts of a whole statutory scheme designed to promote trial by an impartial petit jury, the purposes of the representative-cross-section rule and the peremptory challenge are congruent. Neither should be allowed to undermine the other; both must be delimited to further their common end. The peremptory challenge, exercised in an absolutely unfettered manner, could be abused to strike all members of certain cognizable groups from the jury venire, and so could destroy the representative-cross-section rule. On the other hand, the representative-cross-section rule, applied unflinchingly, exalts demographic representativeness above the overall impartiality it aims to further; indeed, the firmest proponents of the rule advocate not merely limiting but abolishing the peremptory challenge, leaving only challenges for cause. *See Batson, supra*, 476 *U.S.* at ——, 106 *S.Ct.* at 1726, 90 *L.Ed.*2d at 92 (Marshall, J., concurring); J. Van Dyke, *Jury Selection Procedures* at 167–69; Comment, "The Cross-Section Requirement and Jury Impartiality," 73 *Cal.L.Rev.* 1555, 1590 (1985). We decline to adopt this solution, instead choosing to limit the peremptory challenge to its proper purpose.

■ In determining how peremptory challenges may be used without violating the New Jersey Constitution, we, like the Appellate Division, adopt the analysis set forth by the California Supreme Court in *Wheeler*. On this analysis, "[t]he purpose of the challenges also dictates their scope: they are to be used to remove jurors who are believed to entertain a specific bias [that is, "a bias relating to the particular case on

trial or the parties or witnesses thereto," 583 *P.* 2d at 761], and no others." *Id.* at 760. Beyond the scope and therefore a perversion of this purpose are uses of peremptory challenges to remove potential jurors on the basis of presumed "group bias" or mere "group affiliation":

> [W]hen a party presumes that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds—we may call this "group bias"—and peremptorily strikes all such persons for that reason alone, he not only upsets the demographic balance of the venire but frustrates the primary purpose of the representative cross-section requirement. That purpose, as we have seen, is to achieve an overall impartiality by allowing the interaction of the diverse beliefs and values the jurors bring from their group experiences. Manifestly if jurors are struck simply because they may hold those very beliefs, such interaction becomes impossible and the jury will be dominated by the conscious or unconscious prejudices of the majority.
>
> [*Id.* at 761.]

But this impermissible presumed group bias is distinguishable from a prosecutor's exclusion of members of a cognizable group for valid, articulated, trial-related reasons. The latter is illustrated by *Weathersby v. Morris,* 708 *F.*2d 1493 (9th Cir.1983), *cert.* denied, 464 *U.S.* 1046, 104 *S.Ct.* 719, 79 *L.Ed.*2d 181 (1984), where the Ninth Circuit held permissible a prosecutor's peremptory challenges of black potential jurors because he believed they would be subject to intimidation by the Black Guerilla Family, a black prisoner's gang. (The defendant was charged with the murder of a prison inmate, and the prosecutor was aware that members of the Black Guerilla Family were parolees in the geographical area where the trial was being held.)

Permitting questioning of the use of peremptory challenges to determine whether they stem from presumed group bias does not eviscerate them. Historically, it may well have been that the right to exercise peremptory challenges was, "as Blackstone says, an arbitrary and capricious right; and it must be exercised with full freedom, or it fails of its full purpose." *Lewis v. United States,* 146 *U.S.* 370, 378, 13 *S.Ct.* 136, 139, 36 *L.Ed.* 1011, 1014 (1892). But English society in 1305 (and for

that matter in 1789) [5] was a relatively homogeneous society; it knew not the forms of arbitrary, capricious, or invidious discrimination against discrete groups that beset our heterogeneous society. In our society today, the statutory right must be exercised within constitutional bounds, which forbid such arbitrariness and capriciousness, or it fails of its purpose of securing an impartial jury.

Nor does permitting the questioning of the use of peremptory challenges transform them into challenges for cause. The showing of situation-specific bias need not rise to the level required to have a juror excused for cause. The Appellate Division aptly noted, quoting the Second Circuit in *McCray, supra,* 750 *F.*2d at 1132:

> There are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable. Such reasons, if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the ... response and of being alert to reasons that are pretextual. *See, e.g., People v. Hall* [35 *Cal.*3d 161, 197 *Cal.Rptr.* 71], 672 *P.*2d 854, 858 (1983). [199 *N.J.Super.* at 403. *See also Wheeler,* 583 *P.*2d at 760-61.]

The State's fear to the contrary, while understandable, is exaggerated. Between the extreme poles of peremptory-arbitrariness and cause-rationality lies the wide range of reasonable prosecutorial discretion outlined in *Wheeler* and *McCray.* A sovereign that is under a general obligation to govern impartially, along with a specific obligation to afford trial by an impartial jury in all criminal prosecutions, should be confined to this range in its exercise of peremptory challenges.[6]

---

[5]*Swain* traced the "very old credentials" of the peremptory challenge back to the England of 1305. 380 *U.S.* at 212-13, 85 *S.Ct.* at 831-32, 13 *L.Ed.*2d at 768. Blackstone published his *Commentaries* in 1788-89.

[6]We need not resolve the questions whether or to what extent these limitations on the prosecutor's use of peremptory challenges apply to defense counsel's. Nevertheless, we observe that two examples of a defense counsel's exercise of peremptory challenges to exclude members of a cognizable group need to be distinguished: One is the case of a minority defendant excluding

## V

Next, we must formulate the procedures to be followed by trial courts when a defendant alleges that a prosecutor is improperly using peremptory challenges. We must be careful not to place on the defendant a crippling burden of proof that is so inaptly tailored to the right to trial by an impartial jury in all criminal prosecutions that it effectively leaves the defendant a "right" without a remedy. At the same time, we must be cautious not to discourage the prosecutor from using peremptory challenges in all proper instances to further, though not to undermine, the right to trial by an impartial jury. In aiming for this mean, we adapt to this context (rather than directly adopting) the burden-of-proof rules fashioned in "disparate treatment" cases brought under Title VII of the Civil Rights Act of 1964, 42 *U.S.C.A.* §§ 2000e to 2000e–17. *See McDonnell Douglas Corp. v. Green,* 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*

---

white jurors, the other that of a white defendant excluding minority jurors. The Appellate Division spoke to the former, pointing out the futility of an attempt at such reverse discrimination:

> Under our nondiscriminatory rule, it will be numerically improbable for a member of a minority group to stack the jury. We do not envision that our decision today will permit reverse discrimination against whites.... A minority defendant is apt to exhaust his or her peremptory challenges before he or she can eliminate all prospective jurors identified with the majority. See *Commonwealth v. Soares,* 387 *N.E.*2d at 515–516.
> [199 *N.J.Super.* at 406–07.]

More probable and not at all futile is the latter, which the California Supreme Court addressed in *Wheeler:*

> [W]hen a white defendant is charged with a crime against a black victim, the black community as a whole has a legitimate interest in participating in the trial proceedings; that interest will be defeated if the prosecutor does not have the power to thwart any defense attempt to strike all blacks from the jury on the ground of group bias alone. [*Wheeler,* 583 *P.*2d at 765 n. 25.]

The argument for applying *Wheeler's* limitations to defense counsel is considerably stronger in the latter than in the former case. But it will be soon enough to resolve this hypothetical question when a case of either sort actually presents itself to this Court.

2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 *U.S.* 248, 101 *S.Ct.* 1089, 67 *L.Ed.*2d 207 (1981).

> In *Peper v. Princeton Univ. Bd. of Trustees,* we wrote: While we commend the *McDonnell-Douglas* standards to our trial courts as a starting point in actions brought under the Law Against Discrimination or any other State proscription against discrimination, it must be emphasized that these tests are to be used only where and to the extent that their application is appropriate.
> [77 *N.J.* 55, 83 (1978). *See Goodman v. London Metals Exch., Inc.,* 86 *N.J.* 19, 30–31 (1981).]

Both the defendant and the prosecution here seem to agree that application of the *McDonnell-Douglas* framework, as clarified by *Burdine,* is appropriate. Their disagreement appears to concern whether the procedure and burden of proof set forth in the Appellate Division opinion is consistent with that framework. We hold that the following adaptation of the *McDonnell-Douglas* or *Burdine* framework, with which the Appellate Division entirely accords, appropriately accommodates the defendant's constitutional right to trial by an impartial jury and the prosecutor's statutory right to exercise peremptory challenges. Within this framework, the ultimate burden of persuading the trial court that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds remains at all times with the defendant. But the intermediate burden of producing evidence or articulating justifications shifts from the defendant to the prosecution during the course of the inquiry.[7]

---

[7]There are three stages in the *Burdine* framework:

First, the [defendant] has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the [defendant] succeeds in proving the prima facie case, the burden shifts to the [prosecution] to articulate some legitimate, nondiscriminatory reason for the [peremptory challenges]. Third, should the [prosecution] carry this burden, the [defendant] must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [prosecution] were not its true reasons, but were a pretext for discrimination.
[*Burdine,* 450 *U.S.* at 252–53, 101 *S.Ct.* at 1093, 67 *L.Ed.*2d at 215.]

■ As a threshold matter, we emphasize that the defendant must timely object to the prosecution's use of peremptory challenges—during or at the end of the jury selection, but before the petit jury is sworn. This requirement will facilitate the development of as complete a record of the circumstances as is feasible, as well as enabling the trial court to make a fairer determination.

■ We begin with the rebuttable presumption that the prosecution has exercised its peremptory challenges on grounds permissible under Article I, paragraphs 5, 9, and 10 of the New Jersey Constitution. We adopt this presumption for three reasons: first, out of respect for prosecutors, who we do not assume will shirk their obligation to do justice for the cynical cant that their duty is to obtain a conviction; [8] second, out of homage to the very old credentials of the peremptory challenge; and third, out of deference to the legislative intent expressed in *N.J.S.A.* 2A:78–7, which allows peremptory challenges.

■ This presumption may be rebutted, however, upon a defendant's *prima facie* showing that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds. To make out such a case, the defendant initially must establish that the potential jurors wholly or disproportionally excluded were members of a cognizable group within the mean-

---

[8] A New Jersey prosecutor, like a United States Attorney,

is a representative not of an ordinary party to the controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that *guilt shall not escape or innocence suffer.* He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. *It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.*
[*Berger v. United States,* 295 *U.S.* 78, 88, 55 *S.Ct.* 629, 633, 79 *L.Ed.* 1314, 1321 (1935)] (emphases added).

ing of the representative cross-section rule.[9] The defendant then must show that there is a substantial likelihood that the peremptory challenges resulting in the exclusion were based on assumptions about group bias rather than any indication of situation-specific bias. *See McCray v. Abrams, supra,* 750 *F.* 2d at 1132 ("there is a substantial likelihood that the challenges leading to the exclusion have been made on the basis of the individual venireperson's group affiliation rather than because of any indication of a possible inability to decide the case on the basis of the evidence presented").

 In deciding whether the defendant has made out such a *prima facie* case, the trial court should consider all of the relevant circumstances. The following examples are merely illustrative, certainly not exhaustive, of the types of evidence relevant for this purpose:

[T]he party may show that his opponent has struck most or all of the members of the identified group from the venire, or has used a disproportionate number of his peremptories against the group. He may also demonstrate that the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole. Next, the showing may be supplemented when appropriate by such circumstances as the failure of his opponent to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all. Lastly, under *Peters* and *Taylor* the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule; yet if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be called to the court's attention. [*Wheeler,* 583 *P.*2d at 764.]

One of the relevant circumstances that may bespeak discrimination is systematic exclusion in case after case over an extended period of time. But defendant need not make such a showing. We caution trial courts against converting the rebuttable presumption that the prosecution has properly exercised its per-

---

[9]The defendant need not be a member of the excluded group in order to allege a violation of the representative cross-section rule. Defendants though may well be more likely to carry the ultimate burden of persuasion if they are members of the excluded group, especially when the victim is not.

emptory challenges into the effectively irrebuttable presumption under the repudiated systematic exclusion rule of *Swain*.

The burden of establishing a *prima facie* case of purposeful discrimination is not terribly onerous,[10] but neither does it end the inquiry. If the trial court finds that the defendant has established a *prima facie* case, this in effect gives rise to a presumption of unconstitutional action that it is the burden of the prosecution to rebut. *Burdine,* 450 *U.S.* at 254, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 216. The burden shifts to the prosecution to come forward with evidence that the peremptory challenges under review are justifiable on the basis of concerns about situation-specific bias.[11] To carry this burden, the State must articulate "clear and reasonably specific" explanations of its "legitimate reasons" for exercising each of the peremptory challenges. *Burdine, supra,* 450 *U.S.* at 258, 101 *S.Ct.* at 1096, 67 *L.Ed.*2d at 218; *Batson,* 476 *U.S.* at ——, 106 *S.Ct.* at 1723–24 n. 20, 90 *L.Ed.*2d at 88–89 n. 20. The trial court must decide whether these are, on the one hand, genuine and reasonable grounds for believing that potential jurors might have situation-specific biases that would make excusing

---

[10]In *Burdine,* the United States Supreme Court stated:

The burden of establishing a prima facie case of disparate treatment is not onerous. The [defendant] must prove by a preponderance of the evidence that she ... was rejected under circumstances which give rise to an inference of unlawful discrimination. [450 *U.S.* at 253, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 215.]

The Court continued:

[T]he prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors."

[*Id.* at 254, 101 *S.Ct.* at 1094, 67 *L.Ed.*2d at 216 (citation omitted).]

[11]Or, as the United States Supreme Court has often reiterated, "the burden of proof shifts to the State to rebut the presumption of unconstitutional action by showing that permissible racially neutral selection criteria and procedures have produced the monochromatic result." *Alexander v. Louisiana,* 405 *U.S.* 625, 632, 92 *S.Ct.* 1221, 1226, 31 *L.Ed.*2d 536, 542 (1972) (quoted in *Batson, supra,* 476 *U.S.* at ——, 106 *S.Ct.* at 1721, 90 *L.Ed.*2d at 86, and *Washington v. Davis,* 426 *U.S.* 229, 241, 96 *S.Ct.* 2040, 2048, 48 *L.Ed.*2d 597, 608 (1976)).

them reasonable and desirable, given the aim of empanelling a fair and impartial petit jury, or, on the other hand, "sham excuses belatedly contrived to avoid admitting acts of group discrimination." *Wheeler, supra,* 583 *P.*2d at 765.

In order to rebut the defendant's *prima facie* case, the prosecution's justifications of its peremptory challenges need not rise to the level justifying challenges for cause. On the other hand,

> the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race.... Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or "affirming his good faith in individual selections."
>
> [*Batson, supra,* 476 *U.S.* at ——, 106 *S.Ct.* at 1723, 90 *L.Ed.*2d at 88 (citations omitted).]

Between these two poles lies the permissible middle ground of reasonable, nondiscriminatory prosecutorial discretion. Within this range, once again,

> [t]here are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable. Such reasons, if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the prosecutor's response and of being alert to reasons that are pretextual.
>
> [*McCray v. Abrams, supra,* 750 *F.*2d at 1132.]

In short, "to sustain [its] burden of justification, the [prosecution] must satisfy the court that [it] exercised such peremptories on grounds that are reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias...." *Wheeler, supra,* 583 *P.*2d at 765; *accord Batson, supra,* 476 *U.S.* at ——, 106 *S.Ct.* at 1723, 90 *L.Ed.*2d at 88 ("The prosecutor ... must articulate a neutral reason related to the particular case to be tried.")

Permitting such questioning of the use of peremptory challenges does not destroy the "hunch" challenge. There is nothing ineffable or inscrutable about sound "hunches." The experience in California under *Wheeler* should assuage the

State's fears to the contrary. In *People v. Hall*, 35 *Cal.*3d 161, 197 *Cal.Rptr.* 71, 672 *P.*2d 854 (Cal.1983), the California Supreme Court declined an invitation to overrule *Wheeler* on the ground that it precluded effective use of the peremptory challenge in the attempt to select an impartial jury. The Court found that "the People have not produced, or called to our attention, any empirical evidence in support of their criticism of *Wheeler*" and that the People's argument that "restricting the exercise of peremptory challenges to proscribe those prompted by group bias may eliminate the 'hunch' challenge is without demonstrable merit." *Id.* 672 *P.*2d at 859. After all, the Court continued, "A prosecutor may act freely on the basis of 'hunches' unless and until these acts create a prima facie case of group bias, and even then he may rebut the inference." *Id.* In deciding whether the prosecutor has rebutted the inference, the trial court must be sensitive to the possibility that "hunches," "gut reactions," and "seat of the pants instincts" may be colloquial euphemisms for the very prejudice that constitutes impermissible presumed group bias or invidious discrimination. *See Batson, supra*, 476 *U.S.* at ——, 106 *S.Ct.* at 1728, 90 *L.Ed.* 2d at 94 (Marshall, J., concurring).

In the final analysis, the trial court must judge the defendant's *prima facie* case against the prosecution's rebuttal to determine whether the defendant has carried the ultimate burden of proving, by a preponderance of the evidence, that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias. If the defendant is found to have sustained this burden,

> the court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and it must dismiss the jurors thus far selected. So too it must quash any remaining venire, since the complaining party is entitled to a random draw from an entire venire—not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges. Upon such dismissal a different venire shall be drawn and the jury selection process may begin anew.
>
> [*Wheeler, supra*, 583 *P.*2d at 765.]

## VI

Finally, we must apply this framework to the case at hand. Defense counsel made the requisite timely objection, at the end of the jury selection but before the petit jury was sworn. He moved for a mistrial, contending that the assistant prosecutor had unconstitutionally used his peremptory challenges to exclude all qualified Blacks from the jury on the basis of race. The trial court, relying upon the then thoroughly discredited (and now overruled) *Swain*, denied the motion, evidently accepting the assistant prosecutor's argument that "I can exercise my peremptory challenges as I see fit." But the Appellate Division remanded the case to the Law Division to conduct a hearing in order to afford the assistant prosecutor an opportunity to explain his reasons for excusing each and every one of the black potential jurors.

At the remand hearing, the parties stipulated to the identity of six of the seven blacks peremptorily challenged, and agreed that the seventh was either of two persons. Then the assistant prosecutor articulated both his general criteria for exercising peremptory challenges and his specific reasons for excluding each black prospective juror in this case. First, he stated that he wanted jurors who were (1) able to ignore theatrics; (2) more intelligent and of the professional type; and (3) without maternal family instincts. And second, relying upon the transcript of the jury selection and notes he had made after the trial judge denied defendant's motion for a mistrial, he applied these criteria (as well as a residual criterion of "gut reaction" based upon "my life experience") to explain each peremptory challenge of a black venireperson.

The State submits that a review of the assistant prosecutor's seven peremptory challenges of black prospective jurors establishes a "general compliance" with these guidelines, and that his four peremptory challenges of white venirepersons are "extremely probative." But the assistant prosecutor's articulation of the guidelines itself ironically goes far toward establish-

ing a *prima facie* case that he impermissibly discriminated against cognizable groups. And the assistant prosecutor's *failure* to comply with these general criteria by removing other white prospective jurors is highly probative in sustaining the defendant's ultimate burden of proving that he was denied his constitutional right to trial by an impartial jury drawn from a representative cross-section of the community.[12]

First, the assistant prosecutor's articulation of the third criterion—that he wanted jurors who were "without maternal family instincts"—is an admission of presumed group bias in excluding women, a cognizable group for purposes of impartial jury analysis. Furthermore, his admission that he excluded Blacks because he assumed that they were predominantly Baptists is a clear indication of group bias, both racial and religious. And the assistant prosecutor peremptorily challenged not merely a disproportional number of black women and men, but all seven of them. Hence, like the Appellate Division, we are satisfied that defense counsel established a prima facie case of improper use of peremptory challenges at the time he moved for a mistrial.

The presumption that the State properly used its peremptory challenges now gives way, and the burden shifts to the assistant prosecutor to justify his exclusion of all of the black venirepersons on grounds of situation-specific bias. In assessing his proferred justifications, the Appellate Division rightly found highly probative his failure to exercise peremptory challenges to remove white prospective jurors who by his own

---

[12]We incorporate by reference the Appellate Division's penetrating scrutiny of the assistant prosecutor's reasons for peremptorily challenging each named venireperson, black and white. 199 *N.J.Super.* at 410–12. We agree with Justice Clifford, *post* at 547, that the determination whether the prosecution exceeded constitutionally-permissible bounds ordinarily is better made by the trial court than by the Appellate Division. In this case, however, no useful purpose would be served by yet another remand to the trial court.

criteria ought to have been removed.[13] For example, whereas two black women were removed because of their "maternal family instincts" and because they were not "of the professional type," six white women, all of whom by the assistant prosecutor's criteria presumably had "maternal family instincts," were permitted to serve. And five of these six were not "of the professional type," three being housewives and two being secretaries. The only real difference between the two black women and the six white women was their race.

Moreover, given that by the assistant prosecutor's own admission the State had a substantial case and that the issue to be resolved was not very complicated—essentially one of identification of defendant as the perpetrator—the Appellate Division justifiably found that "the assistant prosecutor's explanation that only the intellectual type was suitable for jury duty lacks genuineness." 199 *N.J.Super.* at 411. There was "no reasonable relevancy between the issues to be resolved by the jury and the high intellectual achievement of jurors," *id.* at 411–12, all the more so since the record did not suggest that he insisted upon intellectual achievement by white jurors. This explanation hence does not qualify as a trial-related reason that would rebut the showing of presumed group bias.

Then there is the assistant prosecutor's attempt to justify his exclusion of Blacks as a proxy for exclusion of Baptists, a religious group to whom he assumed Blacks predominantly belonged. Admittedly, given the assistant prosecutor's anticipation that defendant's parents and other Baptist ministers from the Newark area would be alibi and/or character witness-

---

[13]To be sure, the assistant prosecutor did peremptorily challenge four white venirepersons. But instead of rebutting defendant's *prima facie* case, this ironically supports it. For whereas the assistant prosecutor did not seek to bring out through voir dire whether any of the peremptorily challenged Blacks harbored situation-specific bias, 199 *N.J.Super.* at 412, he did so with respect to the four Whites ultimately excluded. Three of these were excused because they were friends or relatives of law-enforcement officials or because they had been the victim of a crime. *Id.*

es, it may seem that he excluded Blacks and therefore Baptists on the basis of valid trial-related reasons. But these alleged trial-related reasons sweep so broadly as to attenuate their validity, for on these assumptions, the exclusion of any and all Blacks living near Newark would be justifiable. If so, "valid trial-related reasons" would become so broad as to approximate presumed group bias itself, and so in this sense lack any real relation to the particular case on trial—particularly where, as here, the State on voir dire made no attempt to determine, first, whether the black venirepersons were Baptists, and second, whether they would be unduly swayed by the testimony of black Baptist ministers. At this point, we can see that what made the reason seem to the assistant prosecutor a valid trial-related reason in the first place is assumptions about Blacks and Baptists that are quite unflattering, not to say invidiously discriminatory, to both the racial group and the religious group.

In sum, the assistant prosecutor indeed did exercise his peremptory challenges as he "saw fit" and in doing so exceeded constitutionally-permissible bounds. The Appellate Division did not err in being persuaded that "the assistant prosecutor's reasons or explanations were 'sham excuses belatedly contrived to avoid admitting acts of group discrimination against all the black prospective jurors.'" 199 *N.J.Super.* at 413 (quoting *Wheeler, supra,* 583 *P.*2d at 765). We hold that defendant sustained his ultimate burden of proving, by a preponderance of the evidence, that the State used its peremptory challenges in violation of Article I, paragraphs 5, 9, and 10 of the New Jersey Constitution.

### VII

Under the New Jersey Constitution, the right to trial by an impartial jury drawn from representative cross-section of the community is of "exceptional significance" and "goes to the very essence of a fair trial." *State v. Williams,* 93 *N.J.* 39, 60

(1983). Its infraction may not be treated as harmless error. Accordingly, we agree with the Appellate Division that the case must be remanded to the Law Division for a new trial. 199 *N.J.Super.* at 413.

Moreover, we agree with the Appellate Division's decision to give this holding limited retroactive effect. *Id.* at 414. In *State v. Nash,* 64 *N.J.* 464, 469–71 (1974), we considered several approaches to retroactivity in criminal decisions, noting that we generally have held that the following factors should be weighed in each case: (1) the purpose of the new rule and whether it would be furthered by a retroactive application; (2) the degree of reliance placed on the old rule by those who administered it; and (3) the effect a retroactive application would have on the administration of justice. *See State v. Czachor,* 82 *N.J.* 392, 408 (1982).

This is a new rule representing a clear break with the past. Defense counsel and the State have relied on the former rule. To give the rule unlimited retroactivity would require reopening innumerable criminal convictions, creating an impossible burden on the State. Moreover, most information about the identity of the jurors and the reasons why the prosecutors exercised peremptory challenges is undoubtedly unavailable at this time. The chaotic aftermath certain to follow unlimited retroactive application patently would result in a substantial adverse effect on the administration of justice. This would far outweigh any purpose to be served by retroactive application of the new rule.

Thus, we affirm the Appellate Division holding that the new rule will apply to this defendant, trials in which the jury selection commenced on or after the date of the Appellate Division opinion, and cases now on appeal in which the issue was preserved in the trial court and the record is adequate to raise the issue.[14]

---

[14]In *North Carolina v. Jackson,* 317 *N.C.* 1, 343 *S.E.*2d 814 (1986), the Supreme Court of North Carolina, because *Batson v. Kentucky* represented a clear break

## VIII

We make no claim that the framework that this opinion sets forth will ferret out, let alone cure, all possible abuses of peremptory challenges. Eliciting a prosecutor's grounds for exercising such challenges will be awkward and difficult. We offer our trial judges no bright-line for distinguishing between permissible grounds of situation-specific bias and impermissible reasons evincing presumed group bias, nor should they want one. Here as in other contexts we ultimately must depend on the judge's sense of fairness and impartial judgment. Although our decision thus is no panacea, it nevertheless is an important step toward insuring that in all criminal prosecutions in New Jersey, the defendant will be afforded his or her right to trial by an impartial jury drawn from a representative cross-section of the community, without discrimination on the basis of religious principles, race, color, ancestry, national origin, or sex.

The judgment of the Appellate Division is affirmed.

O'HERN, J., concurring.

Except for the primacy accorded to the State Constitution, I concur in the opinion and judgment of the Court. We are not required in this case, as we were in *State v. Hunt*, 91 *N.J.* 338, 345 (1982), to inquire whether "[s]ound policy reasons" occasion us to look to the New Jersey Constitution as an independent state ground for decision.

Although the United States Supreme Court's recent decision in *Batson v. Kentucky*, 476 *U.S.* ——, 106 *S.Ct.* 1712, 90 *L.Ed.* 2d 69 (1986), was rooted in Equal Protection Clause analysis, the Court's overriding emphasis on the central position the jury

---

from *Swain v. Alabama*, applied that decision prospectively only to cases in which jury selection commenced on or after the date the United States Supreme Court decided *Batson* (April 30, 1986). We note, though, that *Jackson* rested solely on federal constitutional grounds.

occupies in our system of justice was consistent with this Court's analysis:

> "The very idea of a jury is a body ... composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." [*Id.* at ——, 106 *S.Ct.* at 1717, 90 *L.Ed.*2d at 80–81 (quoting *Strauder v. West Virginia*, 10 *Otto* 303, 308, 100 *U.S.* 303, 308, 25 *L.Ed.* 664, 666 (1880)).]

The language quoted by the Court in *Batson* encompasses the same fundamental principle that this Court finds in paragraphs 5, 9 and 10 of Article I of the New Jersey Constitution:

> This right to trial by an impartial jury, in our heterogeneous society where a defendant's "peers" include members of many diverse groups, entails the right to trial by a jury drawn from a representative cross-section of the community. [*Ante* at 524.]

Hence, I see no occasion to emphasize the independent state source of our decision. The unquestioned subordination of a federal constitutional guarantee of such dimension does not accord with my view of constitutional jurisprudence.

CLIFFORD, J., dissenting.

Except for its concurrence in the judgment of the Court, Justice O'Hern's opinion gains my vote.

I do not join in the judgment of affirmance, however, *not* because I disagree with the salutary principles announced by the Court,[1] but because I do not share the Court's confidence that those principles are being applied correctly in this case. To be blunt about it, unlike the majority and the Appellate Division I am not prepared, on the basis of the record before us, to look the assistant prosecutor in the eye and charge him with giving "sham excuses belatedly contrived to avoid admitting

---

[1]Specifically, I endorse the prohibition against a prosecutor's exercise of peremptory challenges to remove jurors on the basis of their race. I would oppose that practice whether or not the Constitution permitted it. "Not everything the Constitution permits is right, nor does it outlaw everything wrong. I am opposed to [that practice] not because [it is] unconstitutional but because [it is] revolting." E. van den Haag & J. Conrad, *The Death Penalty: A Debate* 181 (1983).

acts of group discrimination against all the black prospective jurors." *Ante* at 543 (quoting *State v. Gilmore*, 199 *N.J.Super.* 389, 413 (App.Div.1985)). It is serious business to tell the State's representative that in exercising his peremptory challenges he "exceeded constitutionally-permissible bounds." *Ante* at 543. An indictment of that magnitude, based—as it must be—on a sensitive appraisal of the prosecutor's purpose and motives as they may have manifested themselves in the courtroom, is better made by the trial court.

We can profit from an occasional reminder of the limitations that our isolation from the courtroom imposes on a full appreciation of the trial dynamics. As Judge Jayne once put it, even the best and most accurate record of oral testimony is like "a dehydrated peach; it has neither the substance nor the flavor of the peach before it was dried." *Trusky v. Ford Motor Co.*, 19 *N.J.Super.* 100, 104 (App.Div.1952). A bloodless record conceals subtle nuances; although we cannot always sniff them out, they do not often escape detection by our trial judges.

The Court agrees that "the determination whether the prosecution exceeded constitutionally-permissible bounds ordinarily is better made by the trial court than by the Appellate Division," *ante* at n. 12, but it sees "no useful purpose [to be] served by yet another remand to the trial court." That is understandable, I suppose, unless one sees, as I do, a moderately useful purpose to be served in assuring that the State is afforded, in *this* case, the same fair treatment that the Court's newly-established procedures seek to guarantee for both prosecution and defense in future cases as well as those that are caught up in the limited-retroactivity net. To that end I would order "yet another" remand to the same trial judge, Hon. A. Donald McKenzie, who conducted the hearings on the first remand, for further proceedings in keeping with the standards set forth in this Court's opinion—specifically, to make findings of fact and conclusions of law, on the basis of the existing record, informed by his sense of the witnesses' credibility, as to "whether the defendant has carried the ultimate burden of

proving, by a preponderance of the evidence, that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias." *Ante* at 538–539.

Moreover, I would encourage the trial court to keep in mind, while making that assessment and within the newly-declared limitations of constitutional considerations, that

> a party is entitled to the visceral reaction of the trial attorney to the prospective juror, and especially to the attorney's appraisal of the venireman's visceral reaction to him, to the extent that it may be divined. This is difficult to identify and articulate, and the tendency to exaggerate it in some considerable degree is no doubt endemic to the trial bar; but it is nonetheless real, it is valuable, and it should be taken into account. [*Roman v. Mitchell*, 82 *N.J.* 336, 361, 413 *A.*2d 322 (1980) (Clifford, J., dissenting in part).]

O'HERN, J., concurring in the result.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

*For remandment*—Justice CLIFFORD—1.