Kaye, J.
(dissenting). The special importance of this appeal is that it calls upon us, for the first time, to spell out the People’s burden once a defendant has established a prima facie case of discrimination in the exercise of peremptory challenges. The United States Supreme Court has not yet been required to do that; nor has our only other opinion on point — People v Scott (70 NY2d 420). By this case we thus set a course for the future in this State, marking out the tolerable limits for the People’s exercise of peremptory challenges.
The course we now set, I believe, diminishes the declared principle that peremptory challenges cannot be used to discriminate against racial or ethnic groups. As Justice Marshall cautioned in Batson v Kentucky, "[a]ny prosecutor can easily assert facially neutral reasons for striking a juror”. (476 US 79, 106.) If that is all that is required, the majority’s decision proves his point that there is indeed little real protection in defendant’s newly recognized equal protection right. I therefore respectfully dissent.
Preliminarily, this case should be decided as a matter of State law, rather than Federal law (majority opn, at 358).
Issues involving the proper exercise of peremptory challenges are especially suited to resolution as a matter of State law at this time. As Justice White made clear in his Batson concurrence, "[m]uch litigation will be required to spell out the contours of the Court’s equal protection holding today, and the significant effect it will have on the conduct of criminal trials cannot be gainsaid.” (476 US, at 102.) In a matter of such day-to-day vital importance locally, the citizens of this State would be well served by the development of an authoritative body of State law instead of being held in suspense, case-by-case, over the next decade of litigation while the United States Supreme Court fleshes out the newly recognized minimum equal protection right that will prevail across the Nation. Several other State courts do exactly this. Indeed, the independent development of State law concerning peremptory *361 challenges has proved particularly beneficial nationally as well as locally. It was, after all, State courts independently construing their State Constitutions that ultimately led the Supreme Court in Batson to abandon Swain v Alabama (380 US 202) and follow "the lead of number of state courts construing their State’s Constitution.” (See, Batson v Kentucky, supra, at 82, n 1.)
Moreover, it cannot be assumed that State law would proceed in lockstep with Federal law as the Federal law on this issue emerges. While this court in People v McCray (57 NY2d 542, cert denied 461 US 961) declined to read the State equal protection right differently from then-existing Federal law, Batson has effected a very significant change in Federal law that might well alter that conclusion. Just such a shift occurred only recently with respect to the exclusionary rule (see, People v P. J. Video, 68 NY2d 296, cert denied 479 US 1091; see also, People v Johnson, 66 NY2d 398, 411 [Titone, J., concurring]).
Thus, I would decide this case as a matter of State law, agreeing with the observation of the New Jersey Supreme Court that the fact "[t]hat the United States Supreme Court has overruled Swain in Batson does not mean that the laboratories operated by leading state courts should now close up shop.” (State v Gilmore, 103 NJ 508, 522, 511 A2d 1150, 1157.)
Reaching the merits, if our review of the prosecutor’s conduct is to become merely a matter of identifying undisturbed findings of fact with some support in the record, or deferring to the trial court and Appellate Division or to the prosecutor’s assertion of some ostensibly neutral ground, then the role of this court in defining and protecting defendant’s nascent constitutional right has been virtually surrendered at the outset. While the Trial Judge’s observations of the unfolding events are of course important, there is still a significant role for this court in clearly articulating the standard and then determining the law question whether the People have satisfied that standard. That has not been done.
This case differs from other "Batson” cases in a critical respect that is not sufficiently credited by the majority. Here, the prosecutor’s "neutral” explanation is one that necessarily produces disparate impact on a single ethnic group. The statistics before us indicate that, in Kings County, virtually all Latinos speak Spanish at home. That this case additionally involves testimony of witnesses in Spanish and an official *362 translator hardly minimizes the potential for disparate impact: we are advised that the State court system employs 113 Spanish translators — presumably rendering accurate translations in court proceedings — who are engaged more than 250 times a day. Accepting as a sufficient explanation that the prosecution will offer the testimony of a witness whose native tongue is Spanish — whether or not an interpreter is required —too easily circumvents the People’s obligation and the defendant’s right, and allows the prosecutor to do by indirection what can no longer be done directly.
An explanation by a prosecutor that may appear facially neutral but nonetheless has a disparate impact on members of defendant’s racial or ethnic group is "inherently suspect.” (Serr & Maney, Racism, Peremptory Challenges, and the Democratic Jury: The Jurisprudence of A Delicate Balance, 79 J Grim L & Criminology 1, 54 [1988].) Consequently, a reason that is grounded largely in speculation rather than facts uncovered in a voir dire examination, as revealed by the record, should not be accepted (see, State v Slappy, 522 So 2d 18 [Fla]; Gamble v State, 257 Ga 325, 357 SE2d 792; State v Gilmore, supra; see also, 2 LaFave & Israel, Criminal Procedure § 21.3 [1989 Pocket Part]). To conclude otherwise can too easily permit discriminatory practices to continue. " '[I]t is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal.’ * * * A prosecutor’s own conscious or unconscious racism may lead him easily to the conclusion that a prospective [Latino] juror is ‘sullen,’ or 'distant,’ a characterization that would not have come to his mind if a white juror had acted identically. A judge’s own conscious or unconscious racism may lead him to accept such an explanation as well supported. * * * [Prosecutor’s peremptories are based on their 'seat-of-the-pants instincts’ * * * Yet 'seat-of-the-pants instincts’ may often be just another term for racial prejudice.” (Batson v Kentucky, 476 US, supra, at 106 [Marshall, J., concurring].)
Here, there is not a sufficient evidentiary record to support the prosecutor’s explanation. Two persons believed to be of "Spanish descent” were excluded because their Spanish language fluency "might interfere with their sworn responsibility as jurors to accept the official translation of the Spanish-proffered testimony.” (Majority opn, at 356.) The majority skews the issue when it states that this case is really about these jurors’ ability "to decide [the] case on the official evidence before them, not on their own personal expertise or language *363 proficiency” (majority opn, at 357); if that were so they undoubtedly would have been excused for cause. Despite this court’s repeated reference to the two jurors’ initial expressed uncertainty or hesitancy, the fact remains that both individuals satisfied the court that they would accept the official court translation, and that they would be fair and impartial jurors. As the Trial Judge stated on the record, the two jurors "said they could listen to what the interpreter said and not let their own evaluation of what the witness says be the answer that they would utilize.” Similarly, the prosecutor acknowledged that the jurors’ "final answer was they could do it” (i.e., accept the official court translation as final).
While the People emphasize their interest in excluding Spanish-speaking jurors because of the presence of an interpreter, there is no indication that any other members of the panel were also asked if they spoke Spanish. Charged by defense counsel with discriminating against the two, it is significant that in offering his explanation to the trial court the prosecutor made no indication of similar interest about the balance of the panel (cf., State v Antwine, 743 SW2d 51 [Mo], cert denied 486 US 1017 [reasons given — inattentiveness during voir dire and relative in prison — were also reasons used to challenge whites]; State v Walton, 227 Neb 559, 418 NW2d 589 [reason given — no ties to community — also used to challenge whites]; see also, 2 LaFave & Israel, op. cit.).
Thus, given the potential for disparate impact and the meager record made by the People on the issue, I cannot agree with the majority that the People have satisfied their burden of rebutting the prima facie case of discrimination in this case.
Where, as here, a language-based reason for exercising peremptory challenges is intimately linked to ethnicity and has the same impact as one that is, in fact, ethnically based, the People’s offer of a neutral explanation must be subjected to enhanced scrutiny. The objective of such scrutiny is not to equate peremptories with challenges for cause but to determine whether the proffered ground is indeed an appropriate reason to exclude such groups from the jury at all. Additional voir dire, either directed or conducted by the court, may not always be necessary, but some investigation or inquiry beyond the minimum mandated in the ordinary case is. Otherwise, absent that somewhat more demanding standard, the prosecution’s removal of all persons of a certain ethnic group, *364 whether intentionally or not, can all too readily be justified by the mere recitation of a language-based reason. In this State, with its varied and often concentrated ethnic populations, the inevitable effect on the composition of our juries of permitting such language-based justifications without close inspection would be intolerable.
In any event, certainly something more is required than the prosecutor’s reference to a subjective impression (based on lack of eye contact) of the sincerity of the jurors’ assurances that they would accept the interpreter’s version of what the witnesses said. All that we know for certain in this case is that defendant is a Latino, and every Latino has been excluded from a panel of 63 individuals. That being so, the inference remains unrebutted that the trial prosecutor struck the last two Latino jurors on the basis of an intuitive judgment deriving from their heritage. The Supreme Court in Batson concluded that the prosecutor "may not rebut the defendant’s prima facie case of discrimination by stating merely that he challenged jurors of the defendant’s race on the assumption — or his intuitive judgment — that they would be partial to the defendant because of their shared race.” (476 US, at 97.) On this record, we really have no more than that.
Finally, I must question the majority’s facile assumption that the explanation offered by the prosecutor was a valid trial-related concern at all. If the interpreters employed by our criminal courts are as accurate as they should be, given that the defendant’s liberty may depend upon the translator’s words, then there should be no disagreement between the translator and jurors fluent in Spanish. Surely, the majority does not intend to suggest, on the other hand, that if the translator is rendering a witness’ testimony inaccurately into English, the State has a valid interest in permitting the errors to go unnoticed. And if the prosecutor’s concern is merely that the jurors may become involved in disputes about nuance and word choice, that could be adequately addressed by an instruction that Spanish-speaking jurors are to adhere to the official translation only, and bring any errors they may discern to the attention of the court, but under no circumstances to the attention of their fellow jurors. What is not a permissible method of addressing the situation is the wholesale exclusion from the jury of anyone sharing defendant’s racial or ethnic background.
On this record, the removal of the last two Latino jurors for *365 what in the end is simply their proficiency in the Spanish language, should not be sanctioned. I would reverse the Appellate Division order and order a new trial.
Chief Judge Wachtler and Judges Simons and Titone concur with Judge Bellacosa; Judge Titone concurs in a separate opinion; Judge Kaye dissents and votes to reverse in another opinion in which Judge Hancock, Jr., concurs; Judge Alexander taking no part.
Order affirmed.