706 A.2d 1109

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
BRADFORD SCOTT, DEFENDANT–APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. HERMAN RAINEY, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued December 12, 1997—Decided February 11, 1998.

Before Judges DREIER, KEEFE and WECKER.

*William F. Mueller*, Designated Counsel, argued the cause for appellant Bradford Scott (*Ivelisse Torres*, Public Defender of New Jersey, attorney; *Karin S. Rieker* and *Mr. Mueller* on the brief).

*Salvatore C. Adamo, Designated Counsel, argued the cause for appellant Herman Rainey* (Ivelisse Torres, *Public Defender of New Jersey, attorney;* Mr. Adamo, *of counsel on the brief).*

*Herman Rainey* submitted two *pro se* briefs.

*Daniel I. Bornstein*, Deputy Attorney General, argued the cause for respondent (*Peter Verniero*, Attorney General of New Jersey, attorney; *Mr. Bornstein*, of counsel and on the brief).

The opinion of the court was delivered by

KEEFE, J.A.D.

A jury found defendants Herman Rainey, a.k.a. Michael Davis, and Bradford Scott guilty of the following offenses [1]: count one, second degree conspiracy to commit robbery in violation of *N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:15–1; count four, second degree aggravated assault on Corey Johnson in violation of *N.J.S.A.* 2C:12–1b(1); count eight, third degree hindering apprehension in violation of *N.J.S.A.* 2C:29–3(b); count twelve, fourth degree assault on Pedro Zamora in violation of *N.J.S.A.* 2C:12–1b(4), a lesser included offense of second degree aggravated assault in violation of *N.J.S.A.* 2C:12–1b(1) for which they were indicted; count fifteen, first degree attempted murder of Robert O'Connor in violation of *N.J.S.A.* 2C:11–3 and *N.J.S.A.* 2C:5–1; count sixteen, second degree aggravated assault upon Robert O'Connor in violation of *N.J.S.A.* 2C:12–1B(1); count nineteen, first degree attempted murder of Yvette Lopez in violation of *N.J.S.A.* 2C:11–3

---

[1] Maurice Davis was also tried with Rainey and Scott. His appeal has been withdrawn. *Separate appeals* were filed by *Rainey* and *Scott.* They were scheduled back-to-back on our calendar. We now consolidate them for the purpose of this opinion.

and *N.J.S.A.* 2C:5–1; count twenty, second degree aggravated assault upon Yvette Lopez in violation of *N.J.S.A.* 2C:12–1B(1); count twenty-two, fourth degree assault on Charles Cefalu in violation of *N.J.S.A.* 2C:12–1b(4), a lesser included offense of second degree aggravated assault in violation of *N.J.S.A.* 2C:12–1B(1) for which they were indicted; count twenty-three, third degree unlawful possession of an assault weapon in violation of *N.J.S.A.* 2C:39–5(f); count twenty-four, third degree unlawful possession of a weapon, a shotgun, in violation of *N.J.S.A.* 2C:39–5(c); count twenty-five, third degree unlawful possession of a handgun in violation of *N.J.S.A.* 2C:39–5(b); and count twenty-six, second degree possession of a weapon for an unlawful purpose in violation of *N.J.S.A.* 2C:39–4(a).

The jury found only Rainey guilty of the following offenses: count two, first degree armed robbery of Corey Johnson in violation of *N.J.S.A.* 2C:15–1; count three, first degree attempted murder of Corey Johnson in violation of *N.J.S.A.* 2C:11–3 and *N.J.S.A.* 2C:5–1; count five, first degree kidnapping of Corey Johnson in violation of *N.J.S.A.* 2C:13–1b(1); count six, third degree possession of a weapon for an unlawful purpose in violation of *N.J.S.A.* 2C:39–5b; count seven, second degree possession of a weapon for an unlawful purpose in violation of *N.J.S.A.* 2C:39–4a.

The jury found both defendants not guilty of: count eleven, first degree attempted murder of Pedro Zamora in violation of *N.J.S.A.* 2C:11–3 and *N.J.S.A.* 2C:5–1; count thirteen, first degree attempted murder of Jose Montalvo in violation of *N.J.S.A.* 2C:11–3 and *N.J.S.A.* 2C:5–1; count fourteen, second degree aggravated assault upon Jose Montalvo in violation of *N.J.S.A.* 2C:12–1b(1); count seventeen, first degree attempted murder of William Connolly in violation of *N.J.S.A.* 2C:11–3 and *N.J.S.A.* 2C:5–1; count eighteen, second degree aggravated assault upon William Connolly in violation of *N.J.S.A.* 2C:12–1b(1); count twenty-one, first degree attempted murder of Charles Cefalu in violation of *N.J.S.A.* 2C:11–3 and *N.J.S.A.* 2C:5–1.

On defendants' motion, the trial judge dismissed count nine, first degree attempted murder of Robert Russo in violation of *N.J.S.A.* 2C:11–3 and *N.J.S.A.* 2C:5–1, and count ten, second degree aggravated assault upon Robert Russo in violation of *N.J.S.A.* 2C:12–1B(1) pertaining to both defendants, and count twenty-seven, fourth degree unlawful possession of "dum " bullets in violation of *N.J.S.A.* 2C:39–3(f) pertaining only to defendant Scott.

Defendant Rainey was sentenced to the following: on count five (kidnapping of Johnson), to an extended term of life imprisonment with a twenty-five year period of parole ineligibility; count sixteen was merged into count fifteen and on count fifteen (attempted murder of O'Connor), to a consecutive term of twenty years, with a ten year period of parole ineligibility; count twenty was merged into count nineteen and on count nineteen (attempted murder of Lopez), to a consecutive term of twenty years, with a ten year period of parole ineligibility; count four was merged into count three and on count three (attempted murder of Johnson), to a concurrent term of twenty years, with a ten year period of parole ineligibility; count one was merged into count two and on count two (robbery), to a concurrent term of twenty years, with a ten year period of parole ineligibility; on count six (unlawful possession of a handgun), to a concurrent term of five years, with a two and one-half year period of parole ineligibility; count seven was merged into counts two and three; on count eight (hindering apprehension), to a concurrent term of five years, with a two and one-half year period of parole ineligibility; on count twelve (aggravated assault), to a concurrent term of eighteen months, with an eighteen month period of parole ineligibility; on count twenty-two (aggravated assault), to a concurrent term of eighteen months, with an eighteen month period of parole ineligibility; on count twenty-three (unlawful possession of an assault weapon), to a concurrent term of five years with a two and one-half year period of parole ineligibility; on count twenty-four (unlawful possession of a shotgun), to a concurrent term of five years with a two and one-half year period of parole ineligibility; and on count twenty-five

(unlawful possession of handguns), to a concurrent term of five years, with a two and one-half year period of parole ineligibility. In sum, Rainey's aggregate sentence is life imprisonment, plus forty years, with a forty-five year period of parole ineligibility. He was also assessed a $2,400.00 V.C.C.B. penalty.

Scott was sentenced as follows: count sixteen was merged into count fifteen and on count fifteen Scott was sentenced to an extended term of life imprisonment with twenty-five years parole ineligibility for the attempted first degree murder of Officer O'Connor; count twenty was merged into count nineteen and on count nineteen to a consecutive term of twenty years imprisonment with ten years parole ineligibility for the attempted first degree murder of Officer Lopez; on count four, to a consecutive term of ten years imprisonment with five years parole ineligibility for the second degree aggravated assault of Johnson; on count one, to a concurrent sentence of ten years imprisonment with five years parole ineligibility for conspiracy to commit the second degree robbery of Johnson; on count eight, five years imprisonment with two and one-half years parole ineligibility for third degree hindering apprehension; on counts twenty-three, twenty-four, and twenty-five, five years imprisonment with two and one-half years parole ineligibility for each of the third degree unlawful possession of weapons counts; and on counts twelve and twenty-two, eighteen months imprisonment with eighteen months parole ineligibility for each of the two fourth degree aggravated assault counts. The court merged count twenty-six, second degree possession of a weapon for an unlawful purpose, with counts twelve, fifteen, nineteen, and twenty-two. Thus, Scott's aggregate sentence is life imprisonment plus thirty years, with forty years of parole ineligibility. The court also imposed a $2,200.00 V.C.C.B. penalty.

Defendants' convictions stemmed from related incidents that began at approximately 4 p.m on May 28, 1991, involving Corey Johnson. Johnson was in a liquor store when he was approached by Rainey and co-defendant Maurice Davis who robbed him of

$114.00 at gunpoint and attempted to abduct him. Johnson resisted their efforts to force him into a gray Cadillac Seville and escaped, but in doing so was shot in the head. Investigation would later reveal that the Cadillac Seville was owned by Milda Rainey, Maurice Davis's mother.

Eric Hankerson (Eric) informed Officers Lopez and O'Connor that he believed the individuals involved in shooting Johnson were in a white Chevette. The three individuals, later identified as the three defendants, Rainey, Scott and Davis, had previously approached Eric and asked him if he knew "Malik." Scott was then armed with a shotgun. Eric also reported that he saw an Uzi in the backseat of the car that Rainey was driving with Scott and Davis as passengers. Eric said that he had seen the same three men in a gray Cadillac Seville two days before, and the same three in the same car the day before Johnson was shot.

Later that evening, Lopez and O'Connor stopped the Chevette that Eric described. Shots were fired from the Chevette at the officers, and a chase ensued. Rainey, who was driving the car, jumped out of the car while it was moving and exchanged gunfire with two other police officers, Cefalu and Zamora. Rainey ran from the scene and was apprehended later in a garage.

In the meantime, the driverless Chevette crashed. By this time, the four police officers already identified were joined by three more, Connolly, Montalvo and Russo. Scott and Davis fired at the officers, and the officers returned the fire. Defendant Scott was shot in the buttock and defendant Davis was shot in the shoulder during the incident. Davis was found in the backseat of the car in a fetal position cradling a machine gun in his arms. Scott was found to be in possession of a loaded .380 semiautomatic in an ankle holster. An expert witness would later testify that the bullet that wounded Johnson came from that gun. A shotgun was also recovered from the scene. Evidence offered at trial showed that the shotgun was owned by Samuel Johnson, who lived in Virginia with his daughter, Laverne Scott. The State contended that Laverne Scott was defendant Scott's wife.

Tony Hankerson (Tony), Eric's brother, gave a statement to the police concerning his knowledge of the incident resulting in the shooting of Johnson. He said that on May 28, 1991, at approximately 4 p.m., he was in a delicatessen in Newark when he saw defendant Scott get out of a gray Cadillac Seville and walk into the delicatessen. Scott then asked those in the store if anyone had seen "Fella," Corey Johnson's apparent nickname. Scott also inquired about a person named "Skeet." Tony replied that he had not seen either "Fella" or "Skeet." Tony then left, and last saw Scott using the telephone inside the store. The evidence would reveal that the delicatessen was only a few buildings away from the liquor store where Johnson was accosted by Rainey and Davis. Tony later recanted his statement concerning his encounter with Scott in the delicatessen, but his statement was admitted into evidence.

Defendants have raised numerous issues on appeal. We have reworded and reorganized them for discussion as follows:

I. WHETHER THE TRIAL COURT'S REFUSAL TO ENTERTAIN ALTERNATIVE REMEDIES TO A POTENTIAL *GILMORE* VIOLATION BY THE PROSECUTOR DURING JURY SELECTION, AND SUBSEQUENT FAILURE TO QUESTION THE PROSECUTOR AS TO HIS REASONS FOR STRIKING BLACK JURORS FROM THE PANEL, WAS REVERSIBLE ERROR?

II. WHETHER THE JURY VERDICT SHOULD BE SET ASIDE BASED UPON ALLEGED JUROR MISCONDUCT?

III. WHETHER DEFENDANTS' CONVICTION SHOULD BE REVERSED BECAUSE THE TRIAL COURT DENIED A MOTION TO SEVER THE CHARGES RELATING TO THE INCIDENT ON MAY 28, 1991, FROM THE CHARGES RELATING TO THE INCIDENT ON MAY 29, 1991?

IV. WHETHER DEFENDANT SCOTT'S CONVICTION ON COUNTS ONE AND FOUR OF THE INDICTMENT, RELATING TO THE MAY 28, 1991, INCIDENT, SHOULD BE REVERSED BECAUSE THE TRIAL COURT IMPROPERLY DENIED DEFENDANT SCOTT'S MOTION FOR A JUDGMENT OF ACQUITTAL ON COUNTS ONE TO SEVEN?

V. WHETHER DEFENDANT SCOTT'S CONVICTION SHOULD BE REVERSED BECAUSE THE COURT ALLOWED A WITNESS TO READ FROM PRISON RECORDS?

VI. WHETHER DEFENDANT SCOTT'S CONVICTION SHOULD BE REVERSED BECAUSE THE PROSECUTOR BROUGHT ATTENTION TO DE-

FENDANT SCOTT'S FAILURE TO TESTIFY DURING THE PROSECU-
TOR'S OPENING STATEMENT?

VII.  WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT
SCOTT'S *MOTION FOR A WADE* HEARING REGARDING TONY HAN-
KERSON'S PHOTO IDENTIFICATION?

VIII.  WHETHER DEFENDANTS' CONVICTION SHOULD BE REVERSED
BECAUSE THE TRIAL COURT PROHIBITED CROSS-EXAMINATION OF
TWO POLICE WITNESSES REGARDING PENDING CRIMINAL
CHARGES?

A.  WHETHER THE COURT IMPERMISSIBLY LIMITED THE CROSS-
EXAMINATION OF POLICE OFFICER BAZYT BERGUS REGARDING
THE CRIMINAL CHARGE FOR RAPE PENDING AGAINST HIM?

B.  WHETHER THE COURT ERRED IN PRECLUDING DEFENSE
COUNSEL FROM CROSS-EXAMINING POLICE OFFICER MONTALVO
REGARDING THE CRIMINAL CHARGE OF FALSIFYING POLICE REC-
ORDS PENDING AGAINST HIM?

IX.  WHETHER DEFENDANT SCOTT'S CONVICTION SHOULD BE RE-
VERSED BECAUSE OF DETECTIVE GOLD'S FAILURE TO TURN OVER
HIS NOTES RELATING TO HIS APRIL 9, 1992, INTERVIEW WITH TONY
HANKERSON?

X.  WHETHER DEFENDANT SCOTT'S CONVICTION SHOULD BE RE-
VERSED BASED UPON THE TRIAL COURT'S DECISION TO RESTRICT
DEFENSE COUNSEL'S CROSS-EXAMINATION OF SPENCER CLARK?

XI.  WHETHER DEFENDANT SCOTT'S CONVICTION SHOULD BE RE-
VERSED BECAUSE THE PROSECUTOR BOLSTERED THE CREDIBILI-
TY OF ONE OF THE PRIMARY POLICE WITNESSES?

XII.  WHETHER DEFENDANT SCOTT'S OR DEFENDANT RAINEY'S SEN-
TENCE IS EXCESSIVE?

XIII.  WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANT
RAINEY'S PRETRIAL MOTION TO DISMISS COUNTS NINE THROUGH
TWENTY-TWO OF THE INDICTMENT AND WHETHER THE EVI-
DENCE WITHHELD FROM THE GRAND JURY WAS CLEARLY EXCUL-
PATORY?

XIV.  WHETHER THE TRIAL COURT RULING PROHIBITING THE DEFEN-
DANT FROM USING POLICE REPORTS TO IMPEACH THE CREDIBILI-
TY OF COREY JOHNSON VIOLATED DEFENDANT RAINEY'S RIGHT
TO CONFRONT WITNESSES AGAINST HIM IN VIOLATION OF THE
14TH AND 6TH AMENDMENTS OF THE UNITED STATES CONSTITU-
TION AND ARTICLE 1, PARAGRAPH 10 OF THE NEW JERSEY STATE
CONSTITUTION OR WHETHER THERE WAS NO EVIDENCE THAT
ANY OF THE INFORMATION IN THE REPORT CAME FROM COREY
JOHNSON?

XV.  WHETHER THE PROSECUTOR'S CROSS-EXAMINATION OF DEFEN-
DANT RAINEY VIOLATED THE TRIAL COURT'S PRIOR *SANDS/BRUN-
SON* RULING AND DEPRIVED DEFENDANT OF A FAIR TRIAL AS

GUARANTEED BY THE 14TH, 5TH AND 6TH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SIMILAR RIGHTS UNDER THE NEW JERSEY CONSTITUTION?

XVI. WHETHER THE CROSS-EXAMINATION OF DEFENDANT RAINEY'S SILENCE AT OR NEAR THE TIME OF HIS ARREST VIOLATES DEFENDANT'S NEW JERSEY COMMON LAW RIGHT TO REMAIN SILENT?

XVII. WHETHER THE TRIAL JUDGE'S DECISION TO ALLOW OFFICERS O'CONNOR AND LOPEZ TO TESTIFY THAT ERIC HANKERSON HAD STATED THAT HE RECEIVED INFORMATION FROM AN UNKNOWN SOURCE THAT THE THREE MEN WHO SHOT COREY JOHNSON WERE RIDING AROUND THE AREA OF AVON AVENUE, AND TO ADMIT A PORTION OF TONY HANKERSON'S STATEMENT WHERE HE STATED THAT HE THOUGHT THAT THE THREE DEFENDANTS WERE ROBBERS, CONSTITUTES REVERSIBLE ERROR?

XVIII. WHETHER THE STATE'S EXPERT, LIEUTENANT DOBAK, WAS IMPROPERLY ALLOWED TO TESTIFY AS TO THE DAMAGE TO PATROL CAR 753 AND TO ANOTHER VEHICLE SO THAT DEFENDANT WAS DEPRIVED OF A FAIR TRIAL?

XIX. WHETHER THE LOWER COURT IMPROPERLY ADMITTED THREE BULLET FRAGMENTS ALLEGEDLY TAKEN FROM COREY JOHNSON'S HEAD AND WHETHER THERE WAS ANY FOUNDATION ESTABLISHED TO SHOW THAT THE BULLET FRAGMENTS WERE THE SAME FRAGMENTS REMOVED FROM COREY JOHNSON'S HEAD?

XX. WHETHER THE CUMULATIVE ERROR DOCTRINE APPLIES IN THIS CASE?

We have reviewed the record in light of the issues presented and are satisfied that any error that we shall identify herein did not have the capacity to affect the result. Accordingly, we affirm the judgments under review.

[At the request of the court, only point I merits publication, and, therefore, the remaining points are omitted.]

## I.

During the jury selection phase of the trial, the attorney for Rainey requested that the trial court compel the prosecutor to disclose his reasons for challenging five particular jurors. He maintained that the court had authority to do so pursuant to *State v. Gilmore*, 103 *N.J.* 508, 511 *A.*2d 1150 (1986). His request was based on the following observation:

[A]ccording to what I saw, juror number 920, black male, had no answers positive to any of the questions that were asked by the Court, either yesterday or today; juror number 836, another young black male, also no answers to any of the questions; juror number 709, a black female, did have some answers to some questions yesterday regarding guns, police officers, victim of a crime; juror number 950, a black female, had no answers; elderly woman, one sitting in seat 14—juror number 948, again, just recently, his last challenge, only answers to any questions she had, that she sat on a civil jury.

However, counsel said he was not making a formal *Gilmore* motion because he did not want the court to dismiss the jurors who had been selected and did not want the court to quash the remaining venire. Counsel for Scott and Davis subsequently joined in the motion.

Judge Cooper stated that, in light of defendants' narrow request, he would not order the prosecutor to provide reasons for any of his peremptory challenges, unless defendants wanted the court to strike the existing jury panel, since that was the remedy that the Supreme Court provided for in *State v. Gilmore*. Judge Cooper explained that, under *Gilmore*, if a defendant establishes that the prosecutor has improperly excluded potential jurors on the basis of race, then the entire panel had to be dismissed and the jury selection process must begin anew. Defense counsel disagreed with Judge Cooper's interpretation of *Gilmore*, arguing that the discharge of the entire panel was not the sole remedy provided by the *Gilmore* decision. We agree with Judge Cooper's interpretation of *Gilmore*.

In *Gilmore*, our Supreme Court determined that under our state constitution a state prosecutor is forbidden from exercising "peremptory challenges to remove potential petit jurors who are members of a cognizable group on the basis of their presumed group bias." 103 *N.J.* 517, 511 *A.2d* 1150. The *Gilmore* decision followed the decision of the Supreme Court of the United States in *Batson v. Kentucky*, 476 *U.S.* 79, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69 (1986), in which the Court held that the use of peremptory challenges to discriminate on the basis of race is a denial of equal protection of the laws. There, the United States Supreme Court set forth a burden shifting test to determine whether or not a

challenge was made on a discriminatory basis, requiring the defense to make a *prima facie* showing that the prosecutor exercised his peremptory strikes in a discrimininatory manner toward a protected cognizable group, and then, once that burden is met, the State has the burden of coming forward with a neutral explanation for challenging the jurors. *Batson, supra,* 476 *U.S.* at 97, 106 *S.Ct.* at 1723, 90 *L.Ed.*2d at 88. Although for the purposes of this case we need not recount in detail that process, suffice it to say that our Supreme Court in *Gilmore* adopted essentially the same procedure as a matter of state constitutional law as the *Batson* Court did on federal constitutional grounds. *See Gilmore, supra,* 103 *N.J.* 533-39, 511 *A.*2d 1150; 103 *N.J.* at 545-46, 511 *A.*2d 1150 (O'Hern, J., concurring).

The crux of this appeal deals not with the process of determining a *Batson-Gilmore* violation, but rather requires us to determine the appropriate remedial action a trial court should take if in fact a violation exists. On this issue, the United States Supreme Court left the task of prescribing the appropriate remedy to the states.

> In light of the variety of jury selection practices followed by our federal and state trial courts, we make no attempt to instruct these courts how best to implement our holding today. For the same reasons, we express no view on whether it is more appropriate in a particular case, upon a finding of discrimination against black jurors, for the trial court to discharge the venire and select a new jury from a panel not previously associated with the case ... or to disallow the discriminatory challenges and resume selection with the improperly challenged jurors reinstated on the venire ....
>
> [*Batson, supra,* 476 *U.S.* at 100 n. 24, 106 *S.Ct.* at 1725 n. 24, 90 *L.Ed.*2d at 90 n. 24.]

In *Gilmore,* our Supreme Court directed the trial courts on how to proceed after it has determined that the prosecutor exercised challenges in an unconstitutional manner:

> In the final analysis, the trial court must judge the defendant's *prima facie* case against the prosecution's rebuttal to determine whether the defendant has carried the ultimate burden of proving, by a preponderance of the evidence, that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias. If the defendant is found to have sustained this burden,

> the court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and it *must* dismiss the jurors thus far selected. *So too it must quash any remaining venire, since the complaining party is entitled to a random draw from an entire venire—not one that has been partially or totally stripped of members of a cognizable group by the improper use of peremptory challenges.* Upon such dismissal a different venire *shall* be drawn and the jury selection process may begin anew.
> [*State v. Gilmore, supra,* 103 *N.J.* at 539, 511 *A.*2d 1150 (citing *People v. Wheeler,* 22 *Cal.*3d 258, 148 *Cal.Rptr.* 890, 906, 583 *P.*2d 748, 765 (1978)) (emphasis added).]

In the present case, the attorneys for the defendants did not want the court to strike the jury panel. Thus, they withdrew their motions. In doing so, however, the defendants eschewed the only remedy that the *Gilmore* decision permits when the State has impermissibly exercised peremptory challenges. Their argument on appeal that the trial court should have fashioned some other remedy is without support in New Jersey. The only appropriate remedy is to start with a new venire that has not been impermissibly stripped of minority membership. Accordingly, we find no error in the trial court's ruling on this issue.

Our decision in this regard is not without consideration of the decisions from other jurisdictions that have implemented other remedies to a *Batson–Gilmore* type violation. Our research reveals that the majority of jurisdictions having addressed the issue leave the decision of determining the appropriate remedy within the discretion of the trial judge to reseat the wrongfully challenged venireperson. *See Morning v. Zapata Protein, Inc.,* 128 *F.*3d 213, 215 (4th Cir. 1997); *United States v. Forbes,* 816 *F.*2d 1006, 1011 (5th Cir. 1987); *Lewis v. Commonwealth,* 25 *Va.App.* 745, 492 *S.E.*2d 492 (1997); *Jones v. State,* 343 *Md.* 584, 683 *A.*2d 520, 529 (1996); *Ezell v. State,* 909 *P.*2d 68, 72 (Okla. Crim. App. 1995); *Commonwealth v. Fruchtman,* 418 *Mass.* 8, 633 *N.E.*2d 369, 373 (1994); *Ellerbee v. State,* 215 *Ga.App.* 312, 450 *S.E.*2d 443, 448 (1994); *People v. Stiff,* 206 *A.D.*2d 235, 620 *N.Y.S.*2d 87, 92 (1994); *Maxwell v. State,* 620 *So.*2d 93, 98 (Ala. Crim. App. 1992); *State ex rel. Curry v. Bowman,* 885 *S.W.*2d 421, 425 (Tex. Crim. App. 1993) (en banc); *Jefferson v. State,* 595 *So.*2d 38, 41 (Fla. 1992); *Griffin v. State,* 610 *So.*2d 354, 356 (Miss. 1992). Only a

handful of jurisdictions have taken the position that the entire venire must be discharged. *See State v. McCollum,* 334 *N.C.* 208, 433 *S.E.*2d 144, 159 (1993); *State v. Jones,* 293 *S.C.* 54, 358 *S.E.*2d 701, 704 (1987); *People v. Wheeler,* 22 *Cal.*3d 258, 148 *Cal.Rptr.* 890, 906, 583 *P.*2d 748, 765 (1978).

It may be that in making their argument to Judge Cooper, defendants were referring to those out-of-state cases that permit "other remedies" short of dismissing the venire. Nonetheless, we are bound by the holding of *Gilmore. Gilmore* unequivocally requires that the entire venire be discharged and the selection process begin anew where there has been an unconstitutional use of a peremptory challenge. We find it to be no coincidence that the decision relied on most heavily in *Gilmore, People v. Wheeler, supra,* expressly adopts the same remedy. If the rule in *Gilmore* is to be reevaluated and modified in light of the weight of authority across the nation, that direction can only be given by our Supreme Court.

Affirmed.