OPINION
HARDIMAN, Circuit Judge.
Albert Hairston appeals the District Court’s order denying his petition for writ of habeas corpus, in which he alleged a violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The District Court, applying the deferential standard of review established in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254, held that Hairston failed to show that the state court’s decision was contrary to, or involved an unreasonable application of, Batson. We will affirm.
I
Unlike most habeas defendants, Hair-ston does not assert his innocence; he admits to shooting two co-workers, one fatally, and claims intoxication as a defense. The New Jersey state court provided a thorough and detailed account of the facts, see State v. Hairston; No. A-4203-91T4 (N.J.Super.Ct.App.Div. Feb. 21, 1995) (slip op.), which the District Court’s opinion recounted as follows:
Hairston worked at a bakery in Long Branch, New Jersey, along with Susan Kerestes and Susan Modoski, the victims of the crimes for which Hairston was tried and convicted. Kerestes and *123 Modoski shared a house together in Kenilworth, New Jersey. Over time, they developed a friendship with Hair-ston and would occasionally drive him home or socialize after work.
On December 28, 1989, Hairston called Kerestes and told her his holiday plans with his girlfriend had not worked out. He asked if he could stay with Kerestes and Modoski for the Christmas weekend. After conferring with Modo-ski, Kerestes told Hairston that he could stay with them. The women picked him up at the bakery at about 4 p.m. and drove him to their home. Hairston stayed on the living room couch for the next two nights. On Christmas morning, Kerestes and Modoski woke early to attend brunch at Kerestes’ parents’ house. Before they left, they told Hair-ston what they had planned for the day, and that Modoski’s father had invited him to Christmas dinner.
Kerestes and Modoski left around 10:00 a.m. and returned home around 1:30 p.m. As they entered through the back door, Modoski stopped at the refrigerator for a drink while Kerestes continued walking towards the dining room. She saw clothes scattered on the floor and assumed that Hairston was in the shower. Then he appeared in the hallway and said, “Oh, I meant to tell you ladies I’m not going.” According to the trial testimony of Kerestes, who survived the events of the next minutes, Hairston then shot Modoski, turned, and began firing at Kerestes. She was hit by a number of shots and was propelled backwards until she fell to the floor of the hallway.
Hairston stopped firing, turned, and walked into the kitchen. Kerestes heard him fire another shot, presumably at Modoski. When Kerestes tried to stand, using a door handle for support, Hairston returned to the hallway and shot at her again. She fell back to the floor and Hairston stood over her. When he fired at her again, she turned her head and the biillet struck the floor next to her. She later described Hair-ston as being “very focused looking straight at her” when he fired that shot.
Kerestes managed to get to her feet, reach a telephone, and call her parents, yelling into the phone for them to call for help. Hairston left the house. An alert went out, and a short time later, a patrolman in the neighboring town of Roselle Park observed and detained Hairston, who was walking across a dirt lot at a quick pace with blood stains on his pants and shoes. After other officers arrived, Hairston was subdued and placed under arrest. He carried $21.61 in change, a two-dollar bill, and a key in his front pants pockets and four twenty-dollar bills in his sock. He claimed that the money was his and that he had a habit of putting money in his socks. The subsequent police investigation indicated that Hairston had stolen this money from Kerestes and Modoski’s house: Hairston’s fingerprints were found on a jar in the house where the victims had kept money, including at the time four twenty-dollar bills, change, and a number of two-dollar bills. At trial Hairston testified that he received the money from an electrical job he had performed prior to the weekend in question.
An officer searching the crime scene near the house found Hairston’s bloodstained denim jacket with a box of bullets and a photograph taken from the house in one of the pockets. Another officer found two pistols in nearby shrubbery. Kerestes confirmed that she and Modoski owned these pistols and that they were the guns that Hair-ston used to shoot them. Hairston’s *124 fingerprints were found on one of the pistols.
Modoski died as a result of the gunshot wounds. Kerestes survived and testified for the State at Hairston’s trial.
Hairston gave the police conflicting accounts of what happened. At times he admitted that he might have shot the victims, while at other times he denied committing the crimes. When he testified in his defense, he said he had been drinking heavily the entire weekend, and that he was very drunk on Christmas day — so drunk that he was hallucinating and thought that the victims were three African-American men who were demanding money for drugs he had bought in New York. He claimed that all he remembered about the shooting was seeing Modoski lying on the floor while Kerestes was screaming at him to get out of the house.
Hairston v. Hendrick, No. Civ. A. 99-5225 (D.N.J. July 27, 2012) (internal citations omitted).
Hairston was charged in state court with first-degree murder and the prosecution sought the death penalty. Hairston pleaded not guilty and was tried before a jury in the fall of 1991. In part because of the high stakes and racial dimension of the trial, voir dire took several months and involved hundreds of potential jurors. Each prospective juror completed a two-part, 19-page questionnaire. Part I contained five questions pertaining to the juror’s background, education, and potential biases; Part II asked five questions about the juror’s views on the death penalty. After administering the questionnaire, the trial court and parties met with each juror individually, asking questions similar to those in the questionnaire. It took 27 days to select the final pool of 52 eligible jurors.
The state exercised ten of its twelve peremptory challenges; seven of the ten were used to strike African-Americans. Hairston’s counsel moved for a mistrial pursuant to Batson and State v. Gilmore, 103 N.J. 508, 511 A.2d 1150 (1986),[1] alleging racial discrimination. After hearing the prosecution’s explanations for exercising its peremptory challenges, as well as defense counsel’s rebuttal, the trial court denied the Batson motion.
Soon thereafter, the jury, which included three African-Americans, was seated. After a thirteen-day trial, the jury convicted Hairston on all counts but did not impose the death penalty. The trial court sentenced Hairston to life imprisonment with forty years’ parole ineligibility.
Hairston appealed to the New Jersey Superior Court, Appellate Division, raising, inter alia, the Batson claim. The Appellate Division affirmed, stating: “After hearing argument by both sides, the trial judge denied defendant’s motion finding that the' State had put forth valid reasons for the exercise of its challenges .... We hold that the [trial] judge’s findings were sufficiently grounded in the record.” A116-17; State v. Hairston, A4203-91 T4 (N.J.App.Div. Feb. 21, 1995) (Hairston II). Hairston appealed to the New Jersey Supreme Court, which denied certification. 140 N.J. 829, 658 A.2d 728 (1995) (Hairston III).
In 1997, Hairston petitioned the same New Jersey trial court for post-conviction relief, again raising the Batson claim. A 125-31 (Hairston IV). The trial court declared the Batson issue moot because it was already resolved on the merits. A131; *125 see N.J. Ct. R. 3:22-5 (barring a petitioner for post-conviction relief from presenting a claim that has been previously adjudicated). Hairston appealed this decision to the New Jersey Superior Court, Appellate Division, which affirmed the trial court’s denial of post-conviction relief. State v. Hairston, No. A4659-96T4 (N.J.Super.Ct.App.Div. Aug. 31, 1998) (Hairston V). The New Jersey Supreme Court again denied certification. State v. Hairston, 158 N.J. 686, 731 A.2d 46 (1999) (Hairston VI).
In November 1999, having exhausted his state remedies, Hairston filed a pro se petition for writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the District of New Jersey. Again, he raised Batson claims along with three other grounds for relief. In February 2000, the District Court dismissed the petition for failure to file within AEDPA’s one-year limitation period. See 28 U.S.C. § 2244(d)(1). Hairston moved to reinstate his petition, arguing that it was timely because the one-year limitation period began to run on April 24, 1996, AEDPA’s effective date, and was tolled while his petition was pending until April 30, 1999, the date the New Jersey Supreme Court denied certification. Therefore, he argued, the one-year limitation period began running on April 30, 1999, and his petition, filed November 9, 1999, was within the one-year limitation period. The District Court agreed and reinstated his petition on March 7, 2000.
Over the next twelve years, Hairston filed pro se motions and wrote letters to the District Court requesting an answer to his petition for habeas relief. On June 17, 2002, Hairston sent a letter to the court inquiring about the case and received a response from Roy Hendrick, Attorney General of New Jersey.[2] On September 2, 2003, Hairston filed a motion to compel the state to answer his habeas petition. The District Court granted the motion to compel on December 1, 2003. The state’s answer to the petition is missing from the record. Over the next nine years, Hair-ston wrote eight more letters to the District Court inquiring about the status of the case.
On July 9, 2012, the District Court denied Hairston’s § 2254 petition and request for a certificate of appealability relying on the record from the state courts; it did not hold an evidentiary hearing. Hairston v. Hendricks, No. Civ. A. 99-5225 (D.N.J. July 27, 2012) (unpublished). Hairston timely appealed and we issued a certificate of appealability for the Batson claim only. We appointed counsel for Hairston.
II[3]
Because the District Court “did not hold an evidentiary hearing and engage in independent factfinding ... our review of its final judgment is plenary.” Hardcastle v. Horn, 368 F.3d 246, 254 (3d Cir.2004) (internal citation and quotation marks omitted). Therefore, we will apply “the same standard [of review] that the District Court was required to apply.” Lewis v. Horn, 581 F.3d 92, 100 (3d Cir.2009) (internal citation omitted).
AEDPA applies to Hairston’s petition, which was filed on November 8, 1999. 28 U.S.C. § 2254. Under AEDPA, we review the state court’s determinations on the merits only to ascertain whether the court *126 reached a decision that was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court ... [or] was based on an unreasonable determination of the facts.” 28 U.S.C. § 2254(d)(1)-(2); Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (internal quotation marks omitted); Bond v. Beard, 539 F.3d 256, 263 (3d Cir.2008). This is a high bar, since a state court’s findings are “presumed to be correct,” 28 U.S.C. § 2254(e)(1), and we may grant ha-beas relief only if “the state court decision ... resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.” Hackett v. Pnce, 381 F.3d 281, 287 (3d Cir.2004).
AEDPA deference is due only if the state court has adjudicated the issue on the merits; if not, we exercise plenary review. See 28 U.S.C. § 2254(e)(1); Holloway v. Horn, 355 F.3d 707, 718 (3d Cir.2004) (“We have interpreted § 2254’s ‘adjudication on the merits’ language to mean that when ... the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA ... do not apply.”) (internal citations and quotation marks omitted).
We review the “last reasoned state-court opinion,” Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), which in this case is Hairston II, the New Jersey Appellate Division’s decision on direct appeal.[4] Therefore, the applicable standard of review hinges on whether the Hairston II court properly adjudicated the Batson claim on the merits. 28 U.S.C. § 2254(d); Richter, 131 S.Ct. at 780.
B
Batson established “a three-step inquiry for determining the constitutionality of challenged peremptory strikes.” Hardcastle, 368 F.3d at 255 (citing Riley v. Taylor, 277 F.3d 261, 275 (3d Cir.2001)).
First, the trial court must determine whether the defendant has made a pri-ma facie showing that the' prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, “[t]he second step of this process does not demand an explanation that is persuasive or even plausible”; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating “the persuasiveness of the justification” proffered by the prosecutor, but “the ultimate burden of persuasion rests with, and never shifts from, the opponent of the strike.”
*127 Rice v. Collins, 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (internal citations omitted).
A Batson claim has been adjudicated on the merits when all three steps of the analysis have been reached. Bond v. Beard, 539 F.3d 256, 264 (3d Cir.2008) (“Failure to make a step-three finding ... would render the state court’s decision either ‘contrary to’ or an ‘unreasonable application’ of Batson ... and we would not apply AEDPA deference.”) (citing Hardcastle, 368 F.3d at 259). Because the Hairston II court “essentially incorporated” the trial court’s reasoning, see Bond, 539 F.3d at 269, we will examine both courts’ adjudications of the Batson claim.
Ill
Jury selection in Hairston’s trial was a painstaking affair, taking several months and involving hundreds of potential jurors. During this process, seven of the state’s ten peremptory challenges were used to strike African-Americans. Defense counsel moved for a mistrial pursuant to Bat-son and Gilmore, alleging that the prosecution exercised its challenges on the basis of race. The trial court found that Hair-ston had succeeded in making a prima facie case of discrimination. The prosecution then proceeded to explain its decisions to strike each of the seven excused African-American jurors.
The first excused juror “struggled with the idea of imposing the death penalty” and believed that “alcohol and drugs make you do things that you wouldn’t do.” A66-67. This led the prosecution to believe she would be amenable to Hairston’s intoxication defense.
The second excused juror showed up on the wrong day and looked uninterested and even “pained by the process.” A68-69. Noting the fact that the juror “went to the Fashion Institute of Technology,” the prosecutor stated: “I know we sometimes make generalizations, but it’s been some of my experience that people in that field tend to be more liberal people.” A68. The prosecutor also believed she lacked the “mental upkeep” required to understand a complex trial. A68-69. The juror indicated that she was opposed to the death penalty “unless the crime was against innocent children,” and “[only] if she was convinced that there was no rehabilitation.” A69.
The third excused juror said he would impose the death penalty only for a premeditated murder, and seemed amenable to imposing a 30-year sentence in this case. He also stated that “the more alcohol people drink, the more they are affects ed,” which led the prosecution to believe he would be sympathetic to the intoxication defense. A71-72. Finally, the prosecution noted that he had not disclosed a prior disorderly-person conviction, which counsel believed rendered him untrustworthy.
The fourth juror believed people could drink so much that they become unaware of their own actions, and appeared to the prosecution as if “she absolutely [did] not want to be [there].” A72. Regarding the death penalty, she stated that “there are always extended [sic] circumstances,” suggesting that she would be prone to finding mitigating factors at the penalty phase. A73.
The fifth juror was excused because he had a graduate degree in behavioral sciences and worked in the alcoholism field for 23 years, leading prosecutors to believe he would be favorably disposed to the intoxication defense.
The sixth juror spoke of “blackouts” from drinking, and, in response to the prosecution’s hypothetical involving the perpetrator of a murder-robbery, stated *128 “I’m not certain. The guy may be innocent.” A77-78. This led the prosecution to believe that she would “never execute.” A77-78.
The seventh juror’s husband was an alcoholic and attended Alcoholics Anonymous meetings herself. She believed that her brother, who was incarcerated at the time, had not been treated fairly by the criminal justice system. In addition, her nephew had been recently charged with dealing drugs in a nearby town, a case that may have been handled by the same prosecutor’s office. This led the prosecution to believe that she might not be able to give their side a “fair hearing.” A78. She also expressed ambivalence about imposing the death penalty.
After the prosecutor articulated these explanations, the trial court turned to defense counsel and asked if he had any other comments to make in response.
THE COURT: Counsel, any response?
[DEFENSE COUNSEL]: I’d like to have some time to prepare an adequate response, your Honor. We’ve talked about 7 jurors right now.
THE COURT: What do you — by proper response you [sic] going to seek to argue that he was reasonable or unreasonable on each one of these?
[DEFENSE COUNSEL]:' Oh absolutely-
THE COURT: Well, I don’t think that’s absolutely necessary, truthfully. He has to put forth an argument that he believes will justify his exercise of challenges; that doesn’t mean that you have a right to respond to each and every statement he made based upon what he says. You disagree with it so be it, but we’re not going to take the time for you to sit down and prepare a step by step rebuttal to this stuff.
A81. Defense counsel responded that the State’s proffered explanations were “vague, unexplainable reasons” and argued that the stricken jurors’ answers had not been very different from those of the remaining, sitting jurors. A81-82. He pointed to one white juror who was an alcoholic and had been through Alcoholics Anonymous three times, yet was not excused. He argued that the prosecution had mischaracterized statements the stricken jurors had made, and that many of the potential jurors excused for being averse to the death penalty had actually expressed “average” support for the death penalty. At various points during defense counsel’s rebuttal, the trial court attempted to cut him off, stating: “[W]e’re not going to argue everybody who’s on this jury as against the people that are off this jury, we will never finish the case that way.” A82. “I don’t want you to go into every sitting juror here, comparing them to people who have been excused. Confine your comments to those people who have been excused you think wrongfully please.” A89.
Defense counsel responded to the trial court by pointing out that Batson and Gilmore actually require courts to consider comparable facts about sitting jurors in order to determine whether the prosecution’s stated reasons were pretextual. Still, the trial court insisted that defense counsel limit his discussion to those jurors who were dismissed.[5] Accordingly, defense counsel confined his rebuttal to the following points: (1) the first juror was presented as weak on the death penalty, *129 but her support for the death penalty was average for the pool of jurors, including the remaining jurors. (2) The second juror, a college graduate, was presented as intellectually incapable of understanding the law yet was more educated than several sitting jurors. (3) The third juror was never asked about his disorderly-person conviction, so he did not fail to disclose it. Moreover, he had expressed that if an alcoholic had an opportunity to get help and did not, then he would readily give the death penalty. (4) The fourth juror’s views on alcoholism would not have trumped his otherwise strongly pro-death penalty stance. (5) The fifth juror was excused partially for her answer to the “reality question” of “could you do it?” but a white male whose answer to the same question was more problematic for the prosecution remained on the jury. (6) The sixth juror had clearly stated that “drugs or alcohol are not an excuse” for criminal conduct. (7) Despite the seventh juror’s experience with alcoholism, she stated that alcohol makes people do things they have within them, and strongly supported the death penalty, expressing concern over the expense of keeping such a perpetrator in prison.
At the conclusion of defense counsel’s rebuttal, the trial judge stated:
Each one of these people took an hour and a half to two hours to qualify when we did the voir dire. It ... is possible ... to pull out in that hour and a half anything ... to support your view.... I find the State has put forth valid reasons for the exercise of these challenges. That the defense doesn’t concur is not surprising. Of course, each side has a very distinct point of view in this case, in all cases, but the defense does not have a right ... to put ... himself into [the] prosecutor’s shoes [to] determine what challenges in their view were valid.
[The] Prosecutor set forth on the record reasons for excusing each one of these people relating to views about the death penalty, reasons about use of alcohol, reasons involving family members in crime, and those reasons I find to be valid and sufficient in the record. Therefore the defense request for a mistrial is denied.
A91-92 (emphasis added). After another comment from defense counsel, the trial court repeated its position, stating: “All the State needs to do it’s done. It [has] set forth reasons which I find to be valid for the exercise of his challenge.” A94.
The. Appellate Division (Hairston II) first found that Batson’s first two steps were satisfied: Hairston had made a prima facie case of discrimination, and the prosecution had presented race-neutral explanations for each of the peremptory challenges used to strike African-American prospective jurors. A 114-17. It then concluded:
After hearing argument by both sides, the trial judge denied defendant’s motion finding that the State had put forth valid reasons for the exercise of its challenges .... We hold that the [trial] judge’s findings were sufficiently grounded in the record and that his denial of a mistrial constituted a reasonable exercise of his discretion. The State carried its burden by articulating clear and reasonably specific explanations of its legitimate reasons for exercising each of the peremptory challenges.
A116-17 (emphases added) (internal citations and quotation marks omitted).
The parties do not dispute that the first two steps of Batson were reached. At issue, then, is whether the Appellate Division — which incorporated the reasoning of the trial court — reached Batson’s third step to determine whether Hairston had *130 carried his burden of proving purposeful discrimination, i.e., “that it is more likely than not that the prosecutor struck at least one juror because of race.” Bond, 539 F.3d at 264 (internal citation omitted). “At step three, the trial judge must make a finding regarding the [prosecutor’s] motivation.” Id. (internal citation and quotation marks omitted).
Unfortunately, this is a case where “[t]he state courts repeatedly failed to identify the three steps of the Batson analysis explicitly. This renders our task harder on review, as we must attempt to discern what those courts did in fact perform at each step.” Bond, 539 F.3d at 268. The record here, as in Bond, “gives serious cause for concern that the state courts did not reach the third step of the Batson analysis.” Id. In Bond, we were troubled that the trial court had indicated that it
believed that it could stop after the prosecutor satisfied the second step of the Batson analysis by stating a race-neutral explanation for a strike. The voir dire transcript never explicitly clarifies whether, in accepting explanations to be race-neutral, the trial court or the Pennsylvania Supreme Court believed that the prosecutor truly had acted in a race-neutral fashion (satisfying step three of the Batson analysis), or merely that the stated explanations were race-neutral (at step two).
Id. We were also concerned that the trial court had stated, as the trial court stated here, that it was “not going to try and get into the [prosecutor’s] mind” and further suggested that it only needed “some objective statement that’s racially neutral.” Id. (internal citations omitted). Nevertheless, after reviewing the state court record closely, we concluded in Bond that the state court had, in fact, reached step three:
The Pennsylvania Supreme Court essentially incorporated the reasoning of the trial court.... It described the trial court as accepting the prosecutor’s explanations as “legitimate and race neutral,” and referred to the trial court’s findings “as to the legitimacy of the race neutral responses offered in this case.” The emphasis on legitimacy demonstrates that the Supreme Court considered the third step of the Batson analysis. Had it stopped at the second step, it merely would have inquired into the existence of “race neutral” explanations or responses. But it also described the legitimacy of those “race neutral” explanations. It considered, in other words, whether the prosecutor had told the truth when he offered race-neutral explanations. It concluded that he had done so. This amounts to a determination on the merits at the third step of the Batson analysis.
Id. at 269.
Here, as in Bond, we are concerned to the extent that the Appellate Division implied that the Batson analysis was over once “[t]he State carried its burden by articulating clear and reasonably specific explanations” of its peremptory challenges. A 117. Scrutiny of the trial court’s ruling from the bench and the Appellate Division’s analysis of the claim, however, shows that neither the trial court nor the Appellate Division stopped at step two. Although the Supreme Court had declined in Batson “to formulate the particular procedures to be followed upon a defendant’s timely objections to a prosecutor’s challenges,” it did instruct that it is the trial court’s “duty to determine if the defendant has established purposeful discrimination.” 476 U.S. at 98, 99, 106 S.Ct. 1712. And the Supreme Court reiterated that “ ‘a finding of intentional discrimination is a finding of fact’ entitled to ... great deference.” Id. at 98 & n. 21, 106 S.Ct. 1712 (quoting *131 Anderson v. Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)). Consistent with this instruction, the trial judge heard argument from both sides about the strikes. Defense counsel made arguments in rebuttal, and then prompted the trial court to consider these arguments, stating:
This is not a case of accepting that the prosecutor has a — valid reasons. You’ve heard the reasons. Now the court’s got to make a determination if they’re valid or not. The only way I think we can do that is to, to reflect that against the people who were not excused....
A91 (emphasis added). The trial court then declared: “[The] Prosecutor set forth on the record reasons for excusing each [stricken juror] ... and those reasons I find to be valid and sufficient in the record.” A92 (emphasis added). In other words, the trial court made a finding that the reasons proffered by the prosecutor, who had conducted voir dire before the judge for 27 days, were credible.
The Appellate Division recognized that the trial judge had proceeded to step three in the Batson analysis. It noted that the trial court did not simply accept the prosecution’s reasons as race-neutral without evaluating their credibility. Rather, the Appellate Division pointed out that the trial court had heard argument from “both sides.” A116. In fact, the record shows the trial court gave defense counsel multiple — though not unlimited — opportunities to rebut the prosecution’s proffered race-neutral explanations. The Appellate Division then concluded that the trial judge had made findings, and held that “the [trial] judge’s findings were sufficiently grounded in the record.” A117 (emphasis added). The focus on the trial judge’s findings demonstrates that the state courts reached the third step of the Batson analysis. Moreover, the phrase “sufficiently grounded in the record” evidences a consideration of all of the facts and arguments presented. This is sufficient to establish a step three finding. See Bond, 539 F.3d at 267 (finding that step three was reached when the trial court stated: “Reviewing the totality of the circumstances, there is no showing of intentional discrimination.”); see also Hardcastle, 368 F.3d at 259 (“[A] judge considering a Batson challenge is not required to comment explicitly on every piece of evidence in the record. However, some engagement with the evidence considered is necessary as part of step three of the Batson inquiry....”).
Obviously, an implicit step-three finding such as the one presented here requires us to engage in analysis that would not be necessary had the trial court explicitly adverted to each step. In Hairston’s case, however, the Batson motion was made during jury selection — in “live combat,” as the District Court put it — and the trial court was able to hear arguments from both sides and make credibility determinations. A17, 19 (“Deference must be paid to the trial judge, who had witnessed the jurors during voir dire and was able from his own experience of the question-and-answer to gauge credibility when the prosecutor gave his reasons.”). The dissent believes that the trial judge was not equipped to make the necessary findings because it did not permit the defense to fully present its ease. We conclude that a trial judge who presided over 27 days of voir dire conducted by the same counsel was well equipped to make a finding about whether he believed the reasons given by the prosecutor for exercising the state’s strike were a pretext for discrimination. Moreover, by referencing both sides’ arguments and the full record, the Appellate Division demonstrated that it had considered the validity of the race-neutral explanations offered by the prosecution. This is a step-three finding, so we apply the defer *132 ential AEDPA standard of review. Bond, 539 F.3d at 269 (citing Taylor v. Horn, 504 F.3d 416, 433 (3d Cir.2007) (explaining that AEDPA deference applies to implicit as well as explicit factual findings)).[6]
IV
As in so many habeas cases, the standard of review is outcome-determinative in this appeal. AEDPA “reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.” Richter, 131 S.Ct. at 786 (quotation omitted). The Supreme Court has stated that AEDPA “ ‘imposes a highly deferential standard for evaluating state-court rulings’ and ‘demands that state-court decisions be given the benefit of the doubt.’ ” Felkner v. Jackson, — U.S. -, 131 S.Ct. 1305, 1307, 179 L.Ed.2d 374 (2011) (internal citation omitted).
Applying AEDPA’s deferential standard of review, we “ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court.” Id. Only if the petitioner demonstrates that the state court decision “was so lacking in justification” as to present error “beyond any possibility for fairminded disagreement” may we grant habeas relief. Id. at 786-87.
Hairston fails to meet this high threshold. The question here is not whether the state court correctly decided the Batson issue but whether there is any reasonable argument to be made that Hairston did not succeed in establishing purposeful discrimination. We hold that there was. A-though defense counsel’s rebuttal raised valid questions, it fell short of compelling the conclusion that the prosecution harbored racially discriminatory intent. Accordingly, we will defer to the Appellate Division’s finding that the prosecution’s exercise of its peremptory challenges was constitutional and affirm the order of the District Court.

. The New Jersey state counterpart to Batson, Gilmore enunciated a similar three-step test to establish unconstitutional discrimination in the use of peremptory challenges. Gilmore, 511 A.2d at 1157.

. This letter is missing from the record. Many of the state court files were purged in 2009, and parts of the District Court record are also, for reasons unknown, unavailable.

. The District Court had jurisdiction under 28 U.S.C. § 2254. We have jurisdiction under 28 U.S.C. § 2253.

. The Supreme Court "reconfirm[ed]” in Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011), that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Id. at 784-85. However, the presumption "may be overcome when there is reason to think another explanation for the state court’s decision is more likely” — such as a dismissal of the claim on procedural grounds. Id. at 785, 787 (internal citations omitted). In this appeal, the presumption of adjudication does not apply to the state court decisions on post-conviction review (Hairston IV-V) because the Batson issue was procedurally barred under New Jersey law.

. Fourteen years later, the Supreme Court held that "side-by-side comparisons” of stricken black jurors and sitting white jurors can be "powerful” evidence of discrimination in a Batson determination. Miller-El v, Dretke, 545 U.S. 231, 241, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).

. Hairston also argues that the Batson claim was not adjudicated on the merits because the state courts exclusively discussed the Gilmore standard and made only passing reference to Batson. See Johnson v. Williams, - U.S. -, 133 S.Ct. 1088, 1096, 185 L.Ed.2d 105 (2013) (establishing a presumption of adjudication on the merits of the federal claim when the state-law rule is “at least as protective as the federal standard’’). The Batson and Gilmore tests are nearly identical, except that the Gilmore standard sets a higher threshold at step one, requiring a showing of a “substantial likelihood” of discrimination, see Johnson v. California, 545 U.S. 162, 172, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005), whereas Bat-son simply requires a statement of facts that creates an “inference of discriminatory purpose” at step one. Batson, 476 U.S. at 94, 106 S.Ct. 1712; see also State v. Osorio, 199 N.J. 486, 973 A.2d 365, 376-77 (2009) (confirming that step one of Batson was less onerous than its Gilmore counterpart).
Here, the state court found that Hairston cleared step one; only step three was at issue. Therefore, on these facts, the Batson standard was not less protective than the state standard, and the presumption of adjudication applies. Williams, 133 S.Ct. at 1096.